USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1820 ROY R. DAMON AND ELEANOR M. DAMON, Plaintiffs - Appellants, v. SUN COMPANY, INC., Defendant - Appellee. ____________________ No. 95-1821 ROY R. DAMON AND ELEANOR M. DAMON, Plaintiffs - Appellees, v. SUN COMPANY, INC., Defendant - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ _____________________ Brian R. Corey, with whom Law Offices of Brian R. Corey was ______________ _____________________________ on brief for Roy R. Damon and Eleanor M. Damon. Michael A. Fitzhugh, with whom Michael John Miguel, Cynthia ___________________ ___________________ _______ S. Phelan and Fitzhugh & Associates were on brief for Sun __________ ______________________ Company, Inc. ____________________ July 5, 1996 ____________________ -2- TORRUELLA, Chief Judge. Plaintiffs brought suit in TORRUELLA, Chief Judge. ___________ this case claiming misrepresentation and violation of Mass. Gen. L. ch. 93A, 11. For the reasons stated herein, we affirm the decision of the district court. BACKGROUND BACKGROUND The parties stipulated to the following facts: Defendant Sun Oil Company, Inc. (R & M) ("Sun") owned property located at 225 Brockton Ave., Abington, Massachusetts, (the "property") from 1971 to 1979. In 1972, Sun built a gasoline station with underground storage tanks on the property and operated a retail gasoline station thereafter until November 1977. On or about December 19, 1974, a leaking underground pipe leading from the underground storage tanks to the pumps released approximately 2,000 gallons of gasoline. Sun's regional manager of operations, Robert Laubinger ("Laubinger"), was on the property after the leak was discovered. On November 21, 1979, the plaintiffs, Roy Damon ("Damon") and Eleanor Damon (together, the "Damons"), purchased the property from Sun for $90,000. The plaintiffs had a right to examine the property by terms of the Agreement of Sale. The Damons owned the property from 1979 to March 25, 1992 and operated a retail service station at the property from June 12, 1980 to January 31, 1991. On January 31, 1991, the plaintiffs leased the property to K. Rooney, Inc. ("Rooney"). Since then, Rooney has operated a retail service station on the property. In November 1991, Rooney began upgrading the station by installing new pumps and Stage II -3- of a vapor recovery system. As digging commenced, the Abington Fire Department observed petroleum product pooling in the surface excavations, shut down the construction and notified the Massachusetts Department of Environmental Protection ("DEP"). On December 19, 1991, the DEP sent a Notice of Responsibility to the plaintiffs and Rooney, requiring that a Phase I Limited Site Investigation Report and Preliminary Assessment Report be completed. A company hired by Rooney performed the investigation and issued a report dated October 1992. As part of the Phase I investigation, monitoring wells were installed and samples of groundwater were taken and analyzed. As a result of the discovery of the pollution, Rooney refused to pay rent from November 1991 to March 1992. The lease agreement between plaintiffs and Rooney granted Rooney an option to purchase the property for $600,000. Rooney did not exercise its lease option. On March 25, 1992, Rooney purchased the property from the Damons by assuming a first mortgage in the amount of $275,000 and a second mortgage in the amount of $50,000. Rooney also made a cash payment of $20,000 to plaintiffs. The district court's additional findings of fact included the following. A rupture of an elbow joint in the pipe which connects the tanks and the pumps caused the 1974 spill, which closed the station for approximately six weeks. In June or July 1979, Damon attempted to reach Richard Bunzell ("Bunzell"), whose name was given on the "For Sale" sign at the station. After some unsuccessful attempts to reach Bunzell, a Sun -4- telephone operator referred Damon to Laubinger, Sun's regional manager for service station maintenance. The questions Damon asked Laubinger about the property included an inquiry concerning the age of the building, and whether Sun had experienced any problems with the station, particularly with the underground tanks. Laubinger knew of the 1974 spill, but did not reveal it. Rather, he answered that it was a "good station" which just needed to be run by a good operator to be successful. After his phone conversation with Laubinger, Damon contacted Bunzell and, after some negotiation, accepted his offer of $90,000. In late August 1979, Damon and Bunzell met at the property to view the property. Damon asked about a depression he noticed in the blacktop near the pumps and Bunzell explained it was caused by the installation of the first stage of a vapor recovery system. In response to Damon's question of whether Sun had had any problems with the underground storage tanks, Bunzell stated, "No, we've had no problems with it. It's all good." In 1980 Damon had the three 6,000 gallon underground gasoline tanks tested for tightness by Getty Oil, Co., his first gasoline supplier: they tested tight, as they did in May 1984 and again in January 1991. In 1992, no holes were observed in any of the underground gasoline tanks or oil tanks. The southern end of the pit dug around the three gasoline tanks yielded the highest level of contamination; 101 cubic yards of contaminated soil were eventually removed for off-site treatment. Finally, samples of contaminated water collected and examined by the -5- company conducting the 1992 Phase I study indicate that the contamination contained the gasoline additive MTBE ("MTBE"), which was not added to Sunoco gasoline until 1984. The Damons brought suit against Sun, alleging common law misrepresentation and violation of chapter 93A, 11. The district court, after a four day bench trial, found for the Damons on both the misrepresentation and the chapter 93A counts, awarding them $245,000 plus reasonable attorney's fees and costs. In its appeal, Sun now challenges the three rulings of the district court -- its denial of Sun's motion for entry of judgment at the close of plaintiffs' case in chief, see Fed. R. ___ Civ. P. 52(c); the district court's judgment and findings pursuant to trial; and its denial of Sun's post-trial motions to alter and amend the judgment and findings and for a new trial, see Fed. R. Civ. P. 59. ___ CAUSATION AND DAMAGES CAUSATION AND DAMAGES A. The Legal Framework A. The Legal Framework ___________________ The Damons charged Sun with the tort of misrepresentation, also referred to as fraud or deceit. See Bond ___ ____ Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 935 (1st Cir. ___________ ___________________ 1985). The elements of misrepresentation are well established: in order to recover, plaintiff must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage. -6- Barret Assocs., Inc. v. Aronson, 190 N.E.2d 867, 868 (Mass. _____________________ _______ 1963) (quoting Kilroy v. Barron, 95 N.E.2d 190, 191 (Mass. ______ ______ 1950)); see Metropolitan Life Ins. Co. v. Ditmore, 729 F.2d 1, 4 ______________________________ _______ (1st Cir. 1984). "The party making the representation need not know that the statement is false if the fact represented is susceptible of actual knowledge." VMark Software, Inc. v. EMC ____________________ ___ Corp., 642 N.E.2d 587, 593 n.9 (Mass. App. Ct. 1994). Here, the _____ alleged false representations are the statements made by Sun's representatives that it was a "good" station, upon which Damon relied in his purchasing decision. The alleged harm suffered was that the Damons bought a gas station in 1979 that would have been worth more in 1992 if what the defendant's representatives stated had in fact been true. The damages were measured by the difference between the value of the property if it had been uncontaminated, as the defendant represented, and the actual value of the property as contaminated. Appellant questions the district court's findings related to two of these elements: causation and damages. The causation element requires that the misrepresentation be a substantial factor in the plaintiff's actions, such that it "tend[s] along with other factors to produce the plaintiff's [harm]." O'Connor v. Raymark Indus., Inc., 518 N.E.2d 510, 513 ________ ____________________ (Mass. 1988). The defendant's conduct need not be the sole cause of the injury: "'It is enough that [plaintiffs] introduce evidence from which reasonable men [and women] may conclude that it is more probable that the event was caused by the defendant -7- than that it was not.'" Mullins v. Pine Manor College, 449 _______ ___________________ N.E.2d 331, 339 (Mass. 1983) (quoting Carey v. General Motors _____ ______________ Corp., 387 N.E.2d 583, 585 (1979)). Damages, in turn, must be _____ proven "with a fair degree of certainty." Pearl v. William _____ _______ Filene's Sons Co., 58 N.E.2d 825, 827 (Mass. 1945); see Squeri v. _________________ ___ ______ McCarrick, 588 N.E.2d 22, 26 (Mass. App. Ct. 1992) ("While proof _________ of damages does not require mathematical precision, it must be based on more than mere speculation."). "Following a bench trial, the court of appeals reviews the trier's factual determinations for clear error, but affords plenary review to the trier's formulation of applicable legal rules." Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. _____ _________________ 1996) (citations omitted); see Fed. R. Civ. P. 52(a); Dedham ___ ______ Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st _________ ____________________________ Cir. 1992). Of course, "to the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal." Id. ___ However, as we have noted in regards to causation, [a]pplication of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder. The SJC has consistently held questions of causation to be for the factfinder. Swift v. United States, 866 F.2d 507, 510 (1st Cir. 1988); see _____ _____________ ___ Dedham Water Co., 972 F.2d at 457 ("As a general rule, causation ________________ questions are grist for the factfinder's mill."); Mullins, 449 _______ N.E.2d at 338; see, e.g., Smith, 76 F.3d at 420, 422-24 (applying ___ ____ _____ -8- the clearly erroneous standard to district court's finding of causation in Title VII context).  B. Causation B. Causation _________ The district court found that the Damons met their burden of proving "by a preponderance of the evidence that the 2,000 gallon spill was a substantial factor in the DEP decision that a gasoline contamination sufficient to trigger 21E liability existed at the [property]." (District Court Findings of Fact and Conclusions of Law, at 8). Sun argues on appeal that the evidence that the district court relied on in finding that Sun more probably than not was a substantial cause of the contamination found in 1991 is insufficient as a matter of law, for three reasons. Upon review of the record, however, we find that the Damons met their burden of proof, such that the district court did not clearly err in finding that the causation element of misrepresentation has been met. We address, and dismiss, each of Sun's arguments in turn.  First, Sun notes that the district court conceded that "it is unclear how much of the 2,000 gallons [of the 1974 spill] was recovered," (District Court Findings of Fact and Conclusions of Law, at 9), and concludes from that statement that there was no evidence of what (if any) contamination found in 1991 actually dated to 1974. The fact that there was a release, without more, Sun argues, is insufficient to impose liability.  There is more, however: the district court found not only that there was a release, but also that the clean-up efforts -9- at the time of the release were limited, at best. Defendant's remedial efforts in 1974 were not conducted for the purpose of ridding the property of contamination; rather, the goal was to make the [property] safe. To this end, the focus was on stopping the flow of gasoline onto the neighboring property -- no effort was made to clean or remove contaminated soil on the [property] itself. From the Abington Fire Department records it is unclear how much of the 2,000 gallons was recovered. Presumably, the company hired by Sun to pump the trenches was pumping a mixture of gas and water, but no one knows the relative proportions or the total amount of mixture pumped. (District Court Findings of Fact and Conclusions of Law, at 9). To suggest that the district court's statement that "it is unclear how much of the 2,000 gallons was recovered" can be read to imply that it was all recovered is to misread the context of the statement. Additional evidence the lower court found determinative in its finding of causation included the sheer size of the 1974 spill (2,000 gallons); the fact that Robert Cataldo ("Cataldo"), plaintiffs' expert, testified that the underground pipe which ran from the pumps to the tanks created a channel along which the gasoline could flow from the rupture and settle under the tanks; and that no gasoline spills larger than 10 gallons occurred at the property between 1974 and 1992, during which time the Damons' tanks periodically tested tight. Finally, the court also noted that "Cataldo testified, albeit hesitatingly, that in his opinion the 1974 spill was a substantial factor contributing to the contamination found at the [property] in 1992." (District Court -10- Findings of Fact and Conclusions of Law, at 10). Clearly, the evidence the district court relied on in finding causation goes beyond the simple fact that there was a release in 1974. Sun does not challenge any of these specific findings; indeed, our review of the record finds support for each.  In making its argument, Sun relies on Providence & _____________ Worcester R.R. Co. v. Chevron U.S.A., Inc., 622 N.E.2d 262 (Mass. __________________ ____________________ 1993). In that case, contamination was discovered in 1988 on property owned by the plaintiff railroad. The railroad sued defendant Chevron, claiming that the 1988 contamination was caused by a 1972 leak of 12,000 gallons of fuel oil from a storage facility defendant had maintained on the property. The court found no causal link between the spills, where there was no evidence that the soil was significantly saturated by the 1972 surface spill, which had been pumped out the same day, where sixteen years had passed, and where the question whether the oil would remain in some form was left unanswered in the face of conflicting evidence. The court specifically noted that the railroad's expert was not asked to give an opinion whether the 1988 contamination was caused at least in part by the 1972 spill. Id. at 264.  ___ Sun draws on Providence & Worcester as demonstrating _______________________ that evidence of the 1974 spill, in and of itself, is insufficient to impose liability. That may be true, as far as it goes. The evidence in the present case, however, shows much more. As in Providence & Worcester, many years passed between _______________________ -11- the spills in the present case. However, the evidence is that the 1974 spill was not cleaned up immediately, as in Providence & ____________ Worcester. Rather, the fire department logs indicate that _________ pumping did not start until two days after discovery of the leak on December 19, 1974: as late as February 4, 1975, more than a month after the leak was first reported, gasoline fumes were still being detected in the basement of an adjacent property. Thus, there was evidence in this case that the soil was contaminated by the 1974 spill. What is more, plaintiffs' expert here did state that the 1974 spill was a substantial factor contributing to the 1991 contamination, as we discuss below. Sun's second attack on the sufficiency of the evidence focuses on the soil. In the face of the uncontested fact that the 1974 spillage was subsurface, due to a leaky underground pump, Sun contends that no evidence was presented that the soil was contaminated by Sun, or that Sun's failure to clean up or remove soil was wrongful. In support of its position, Sun lists four pieces of evidence regarding soil testing. Firstly, it notes that soil samples taken in 1992 by consultants were spoiled, and never analyzed. While it is unfortunate that the samples were not analyzed, that fact simply shows we do not have all possible information: it does not shed any light, one way or the other, on whether the 1974 spillage contaminated the soil. Secondly, Sun points out that in 1979, Getty Oil commissioned a company to dig around the fill area above the storage tanks, and that the company never said anything to Damon about contaminated -12- soil, but rather stated that the area was clean. However, Sun points to no evidence that the company was asked to do an examination of the soil for contamination: it was testing the tanks for tightness. Thus, the third fact Sun looks to for support, that Cataldo's environmental company found contamination in 1992 around the same fill pipes that Getty Oil, in 1980, had told Damon were clean, is not as conclusive as Sun would like. Set against the Getty results is Cataldo's testimony that the 1974 release was a contributing factor in the 1991 contamination. Finally, Sun notes that Cataldo testified that there was not much thickness of soil, such that "flushing" of the soil by rising and falling subsurface groundwater elevations would tend to reduce any residual contamination. However, Cataldo also testified that the on-site testing he conducted in four monitoring wells found volatile organic compounds ("VOCs") which are constituents of gasoline in the groundwater. The constituents found in 1991, he stated, were similar to those of the 1974 release. As he stated in his testimony: Q. . . . . And based on your examination of the underground conditions at that [property] and the geology of the [property], and based upon the information of this 2,000 gallon spill in 1974, would you expect to find VOCs in the areas where you did find them in 1992? A. Yes, I would. Q. Is the presence of VOCs consistent with the topography and geology of that [property] and a spill in 1974? A. Yes, it is. (Day 2, page 76). On this record, we find that the evidence was -13- sufficient to find causation. The evidence to which Sun points does not convince us otherwise, let alone that the district court clearly erred in making its finding.  Sun's third and final argument that the evidence is insufficient to find causation focuses on Cataldo's testimony. It is fundamental that "[e]xpert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion. " In re Salvatore, 46 B.R. 247, 253 (D.R.I. 1984). ________________ Thus, "[a]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." Van Brode Group, Inc. v. Bowditch & _______________________ __________ Dewey, 633 N.E.2d 424, 430 (Mass. App. Ct. 1994). Cataldo's _____ testimony, Sun contends, did not meet this criteria. Although Cataldo testified that the 1974 spill was a "substantial factor" in the 1991 contamination, Sun argues that its cross-examination of Cataldo revealed that he had no factual basis for that conclusion: indeed, he testified at one point that he could not say that the 1974 spill was "more probably than not" the cause of the 1991 contamination.  Sun points to a series of perceived flaws in Cataldo's testimony. First, Cataldo attested that although methods exist which would quantify the amount of contaminants found in 1992 which were representative of the 1974 release, none were performed here. He agreed that he did not know how much gas was left on the property after the 1974 release, and that none of the work performed by his firm had to do with aging or dating the -14- petroleum product found on the property. Nor did they test to determine what percentage of the gas found in 1991 was 1974 gas. After admitting that the ratios of the BTEX chemical constituents were indicative of a more recent -- post-1980 -- release, Cataldo testified that he could not say "one way or the other" that the gasoline constituents encountered in 1992 were more probably than not the result of the 1974 release. Thus, Sun maintains, the best Cataldo could testify to at trial was that the property was insufficiently investigated to allow him to come to any ultimate conclusions concerning the contaminate sources; that since the 1974 release was the only known release, it at least partially caused the 1991 contamination; and that there was no way of apportioning what amounts, if any, of the 1991 contamination were attributable to Sun based on the work done to date. This opinion, Sun concludes, is insufficient as a matter of law.  We disagree. The issue is not whether Cataldo was right: but, rather, whether he had sufficient factual grounds on which to draw conclusions. See Van Brode Group, Inc., 633 N.E.2d ___ _____________________ at 430. On the basis of our review of the record, we conclude that Cataldo's expert testimony was predicated on facts legally sufficient to provide a basis for his conclusions. There is no doubt that more testing could have been done on the property, which would have been helpful to the factfinder. However, Cataldo noted that although there are methods to attempt to quantify the amount of contaminants dating back to 1974, he does not know "if there's anything that really can say, yes or no, how -15- much there is." (Day 2, page 133). He drew his conclusions on the basis of his "experience with dealing with gasoline stations, residual contamination, [and] the knowledge that the only significant or large release at the [property] was reportedly the 2,000 gallons in 1974." (Day 2, page 71). He and his personnel visited the property, investigated its history, and made tests, from which he drew his conclusions. His testimony reflects his research: asked how gas spilled in 1974 could still be present in 1992, he stated, A. Because the gasoline tends to absorb and holds in to some of the soil. It also fills up the pores between the soil and clings in to that. The [property] was paved, so that all the rain that falls in it doesn't get a chance to percolate through, so you don't have that complete flushing action that you would in an open field. Most of the rainwater probably channeled off, and that's one of the purposes of blacktop. So it's my opinion that there would still be some remnants of the gasoline remaining. (Day 2, page 87). He later noted that biodegradation alone would not have removed contamination of the scale of 2,000 gallons over 18 years, and that there had been a reported release of four gallons subsequent to 1980, which would be sufficient to account for the levels of MTBE found. As the district court noted, his attribution of the contamination, at least in part, to the 1974 contamination, "has an additional earmark of trustworthiness because it was prepared for a third-party, Rooney, pursuant to an order of the DEP, and not in any way in anticipation of this litigation." (District Court Findings of Fact and Conclusions of -16- Law, at 11). Cf. Venturelli v. Cincinnati, Inc., 850 F.2d 825, ___ __________ _________________ 832 (1st Cir. 1988) ("The decision of whether an expert is adequately qualified is a matter primarily for the district court."). In arguing that Cataldo's testimony provides insufficient basis, Sun also relies on Providence & Worcester for ______________________ the proposition that the Damons were "required to bring forth an expert opinion that the on-site activity on the subject property during Sun's operation of gasoline station (1972-1977) was more probably than not a substantial factor in causing the contamination found on the property in 1992." (Brief of Appellant, at 19). We disregard this argument, for two reasons. First, in Providence & Worcester, although the SJC found it _______________________ significant that the railroad's expert did not testify as to causation, the court specifically noted that it "[did] not say that expert testimony is required to establish causation in every soil contamination case." 622 N.E.2d at 264 (noting that the subject "is not one that jurors would be expected to understand in many circumstances without guidance from an expert"). We will not create such a requirement here. Second, even if that requirement existed, plaintiff met it. Cataldo explicitly, if reluctantly, testified that the 1974 spill was "a substantial factor" in the contamination detected in 1991, a fact the district court noted twice in its finding of causation. In sum, then, we find that the district court did not clearly err in finding that Sun's acts were a substantial cause of the DEP -17- decision that contamination sufficient to trigger 21E liability existed at the property.  We note that the district court's task of determining causation on this record was not an easy one. Nonetheless, "[w]hen the evidence supports conflicting inferences, the district court's choice from among the several inferences cannot be clearly erroneous." Dedham Water Co., 972 F.2d at 462. Thus ________________ we uphold the district court, and reject Sun's argument that the evidence upon which the district court relied is insufficient.  C. Damages and the Burden of Proof C. Damages and the Burden of Proof _______________________________ The parties dispute who bore the burden of proof regarding whether the harm was divisible. The backdrop to their dialogue is the fact that the evidence indicates that Sun was not the only owner or operator of the property whose acts led to the 1991 contamination. As the district court stated, the presence of MTBE "compel(s) the conclusion that there had been a widespread release of gasoline at the [property] after 1984, when MTBE became common." (District Court Findings of Fact and Conclusions of Law, at 10). Thus, there was at least one release of gasoline when the property was operated by Rooney or the plaintiffs. The Damons concede that the evidence and findings indicate that there was a post-1980 release of gasoline. At the same time, there was no evidence of a spill greater than 10 gallons, and the district court specifically found that during -18- the time the Damons owned the property, no significant leaks occurred.1 The Damons bear the burden of proving that tortious conduct by Sun caused them harm. See Restatement (2d) of Torts ___ 433B(1). They were required to produce evidence that it is more likely than not that Sun's conduct was a substantial factor in bringing about the harm they suffered. See id. comment a ___ ___ (noting that "[a] mere possibility of such causation is not enough"). Sun argues that the Damons did not meet their burden of showing that Sun's conduct substantially caused the harm they suffered. Accordingly, it maintains, the burden of identifying what other actors were also responsible for the harm and of allocating the harm (or showing that it was indivisible) remained with the plaintiffs, who did not fulfill that task. However, we have already established above that the district court did not err in finding that Sun's conduct substantially caused the harm the Damons suffered. Therefore, the burden shifted to Sun, as did the cost of not meeting it. See Restatement (2d) of Torts  ___ 433B(2) ("Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the  ____________________ 1 Sun argues that the district court's factual findings are inconsistent. We disagree: the evidence at trial indicated that a spill as small as four gallons could account for the amount of MTBE present, and that Cataldo's research found no record of any spills over ten gallons. The evidence leads to the inference that a spill made up of less than ten gallons, but which was nonetheless spread out (or several such spills), could account for the MTBE found.  -19- harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."); see also ________ O'Neil v. Picillo, 883 F.2d 176, 178 (1st Cir. 1989) (noting, in ______ _______ CERCLA action, that rule based on the Restatement (2d) of Torts requires that damages be apportioned only if defendant shows that the harm is divisible), cert. denied sub nom. American Cyanamid _____________________ __________________ Co. v. O'Neil, 493 U.S. 1071 (1990). Accordingly, we find no ___ ______ error in the district court's apparent allocation of the burden of proof, and need not enter into the parties' dispute over who bore what burden, and whether divisibility was indeed shown.  SUFFICIENCY OF THE EVIDENCE SUFFICIENCY OF THE EVIDENCE Sun challenges the sufficiency of the evidence, contending that the district court's findings were clearly erroneous and highly prejudicial to Sun's case in three instances. We examine such challenges to the district court's factual findings for clear error. See O'Brien v. Papa Gino's of ___ _______ ______________ America, Inc., 780 F.2d 1067, 1076 (1st Cir. 1986). To ______________ demonstrate that the Damons did not meet their burden of proving misrepresentation by a preponderance of the evidence, Sun "must show that the verdict was against the great weight of the evidence, viewed in the light most favorable to [the Damons], or would work a clear miscarriage of justice." Cambridge Plating __________________ Co. v. Napco, Inc., No. 95-1781, slip op. at 26 (1st Cir. June 3, ___ ___________ 1996). We address each of Sun's contentions in turn. A. The Alleged Representations A. The Alleged Representations ___________________________ Sun first alleges that the alleged representations were -20- opinions and not statements of fact. The distinction is a crucial one, as it is well established that the latter can ordinarily be the basis of a claim of fraud, but the former cannot. See, e.g., Briggs v. Carol Cars, Inc., 553 N.E.2d 930, ___ ____ ______ ________________ (Mass. 1990) (noting that a statement which is an opinion in form "in some circumstances may reasonably be interpreted by the recipient to imply that the maker of the statement knows facts that justify the opinion"); Coe v. Ware, 171 N.E. 732, 734 (Mass. ___ ____ 1930). The determination of whether a statement is of opinion or fact is a factual one, see id., and so we review only for clear ___ ___ error.  The district court held that It should have been clear from Damon's questions [to Sun's agents] that he was concerned about the past and future integrity of the entire underground gas delivery system; as Damon testified at trial, "the only thing you've got in a gas station is tanks and pumps and the lines. I mean, what else is there?" (District Court Findings of Fact and Conclusions of Law, at 7 n.1). Sun contends that there is no evidentiary basis for such a finding. Seeking support, it points to the district court's statement during closing arguments that the testimony that [Damon] had, that they told him it was a good station, is not significant in my view because that's absolutely an opinion rather than a statement of fact. (Day 4, page 15), and contends that by making this comment the district court essentially conceded that there was no evidentiary basis to find that the statements by the Sun employees were -21- opinion. To the contrary, all this statement reveals is that the district court changed its mind as to the significance of the statements, which is certainly within its province to do. Indeed, that is the very mission of closing arguments: to convince the factfinder that a party's view of the facts is correct.  Similarly, that Damon's testimony about the conversations could be viewed as inconsistent, as Sun notes, is a question that addresses Damon's credibility, not the district court's finding. Credibility, of course, is an issue for the factfinder, and Sun has shown us no clear error in the district court's judgment on the matter. See O'Brien, 780 F.2d at 1076 ___ _______ ("No subject matter is more clearly within the exclusive province of the fact-finder than this."). Our review of the record leads us to affirm the district court's finding that the statements were factual in nature. First, we note that the evidence supports the findings. The court found that Damon asked Bunzell if Sun had had any problems with the underground storage tanks, to which Bunzell responded that Sun had had "no problems with it. It's all good." (District Court Findings of Fact and Conclusions of Law, at 5). This is consistent with Damon's testimony at trial. Bunzell's testimony did not contradict him, since he stated in his affidavit, entered at trial, that he neither remembered the sale of the property nor recalled any discussion of it or the terms of the sale. The district court also found that although Laubinger -22- knew about the 1974 spill -- indeed, he visited the property at the time -- he did not reveal the information to Damon. Instead, he responded to Damon's questions about whether Sun had any problems with the station, particularly with the underground tanks, by stating "that it was a 'good station' which just needed to be run by a good operator to be successful." (District Court Findings of Fact and Conclusions of Law, at 5). This was consistent with Damon's testimony at trial. Laubinger testified that he did not recall having a telephone conversation with Damon or ever not telling anyone about the release in discussing the property, and the trial court was free to credit Damon's more specific recollection.  Next, in discussing whether the Bunzell and Laubinger statements were opinions or fact, the district court noted that Damon's questions were not just about the current conditions on the property. If they had been, their statements that it was a good station would presumably have been opinion. Rather, the district court specified that the questions also went to whether there had been problems in the station in the past of which Damon should be aware, with the underground tanks specifically. In that context, reading the record in the light most favorable to the Damons, we do not find that the district court erred in finding that the Sun representatives' statements that it was a "good station" were factual. Indeed, we are hard put to see how, where there has been a spill of 2,000 gallons in 1974, which Sun knew of, statements five years later that it was a "good station" -23- and that Sun had had "no problems with it" in reply to a question regarding the underground tanks are not misrepresentations of fact. B. Evidence of the Elements of Fraud B. Evidence of the Elements of Fraud _________________________________ Sun's second contention is that the record contains no evidence of the key elements needed to prove fraud. First, Sun asserts that the statements by Bunzell and Laubinger were not misrepresentations of material facts, and thus the first element of the tort has not been shown. See Barret Assocs., Inc., 190 ___ _____________________ N.E.2d at 868 (noting that the first element is that "defendant made a false representation of a material fact"). We disagree. There can be no doubt that the statements were misrepresentations in terms of the past history of the property: stating that it is a "good station" ignores the fact that there was a 2,000 gallon spill. It may have been a "good station" in 1979, from Sun's perspective: the spill had been cleaned up in accordance with the requirements of the time, and there is no evidence of other problems. Nonetheless, there had been a problem in the past, and to omit that was to misrepresent the situation. The district court found that the fact was material, as it gave credence to Damon's testimony that his affiliation with a car dealership which sold gasoline gave him a general awareness of the growing importance of environmental issues, and that he would not have bought the station had he been aware of the spill. Thus, the statements by the Sun representatives were certainly "'one of the principal grounds, though not necessarily the sole ground, that -24- caused the plaintiff[s] "to take the particular action that the wrongdoer intended he would take as a result of such representations."'" Bond Leather Co., 764 F.2d at 936 (quoting ________________ National Car Rental Sys., Inc. v. Mills Transfer Co., 384 N.E.2d _______________________________ __________________ 1263 (Mass. App. Ct. 1979) (quoting National Shawmut Bank v. ______________________ Johnson, 58 N.E.2d 849 (Mass. 1945))). While this testimony is _______ undoubtedly in Damon's interest, the district court's credence in that testimony has not been shown to be in error. See O'Brien, ___ _______ 780 F.2d at 1076. Finally, we have already established that these were factual statements. Thus, the statements were misrepresentations of material facts. Sun tries to fend off this conclusion by pointing out that "[s]ellers . . . are not liable in fraud for failing to disclose every latent defect known to them which reduces materially the value of the property and of which the buyer is ignorant." Nei v. Burley, 446 N.E.2d 674, 676 (Mass. 1983). ___ ______ However, it is well established that "in Massachusetts . . . a party who discloses partial information that may be misleading has a duty to reveal all the material facts he [or she] knows to avoid deceiving the other party." V.S.H. Realty, Inc. v. Texaco, ___________________ _______ Inc., 757 F.2d 411, 415 (1st Cir. 1985); cf. Nei, 446 N.E.2d at ____ ___ ___ 676 (finding no misrepresentation where seller "did not convey half truths . . . [or] make a partial disclosure of the kind which so often requires a full acknowledgement to avoid deception"). Accordingly, we find Maxwell v. Ratcliffe, 254 _______ _________ N.E.2d 250, 252 (Mass. 1969), analogous to the Damons' position. -25- In that case, potential buyers of a house asked whether the cellar was dry, and the brokers represented that it was, when they had, or should have had, knowledge that there was periodic water seepage. The Court found that "because the question of the dryness of the cellar had been raised expressly, there was special obligation on the brokers to avoid half truths and to make disclosure at least of any facts known to them or with respect to which they had been put on notice." Id. at 252-53; ___ see Greenery Rehabilitation Group, Inc. v. Antaramian, 628 N.E.2d ___ ___________________________________ __________ 1291, 1294 (Mass. App. Ct. 1994) (noting, inter alia, that buyers __________ did not request financial information about tenant from seller in finding that situation was not a case of partial disclosure).  Sun also seeks support from the fact that Damon signed an agreement representing that he had inspected the property and would indemnify Sun from and against liability for violation of environmental laws. However, "Massachusetts case law unequivocally rejects assertion of an 'as is' clause as an automatic defense against allegations of fraud." V.S.H. Realty, ______________ Inc., 757 F.2d at 418 (noting also that Uniform Commercial Code  ____ 2-316, which allows disclaimers in the sale of goods between merchants, does not preclude claims based on fraud); see Turner ___ ______ v. Johnson & Johnson, 809 F.2d 90, 95-98 (1st Cir. 1986) __________________ (discussing basis and limits of Massachusetts rule that parties may not contract out of fraud). Nei v. Burley, which Sun cites, ___ ______ offers it no support. There, the court relied on the absence of a duty to disclose the latent defect, not the fact that the -26- sellers provided the buyers with test results, in finding there had been no tort of fraud. 446 N.E.2d at 676-77. Sun challenges the evidentiary basis for a second element, that the party making the representation have knowledge of its falsity. See Barret Assocs., Inc., 190 N.E.2d at 868. ___ _____________________ Clearly Laubinger knew of the 1974 spillage -- he had been on the property during the clean-up, and was able to testify in some detail about the event. It stretches credence to posit that he would not have knowledge of the falsity of stating that it was a good station when asked about past problems. There is no evidence that Bunzell had actual knowledge. However, under Massachusetts law, the party making a misrepresentation "need not know that the statement is false if the fact represented is susceptible of actual knowledge." VMark Software, Inc., 642 _____________________ N.E.2d at 593 n.9; see Snyder v. Sperry and Hutchinson Co., 333 ___ ______ __________________________ N.E.2d 421, 428 (Mass. 1975); Zimmerman v. Kent, 575 N.E.2d 70, _________ ____ 74 (Mass. App. Ct. 1991). The district court found that while inspecting the station Damon asked Bunzell about a depression in the blacktop, and whether there had been any problems with the underground storage tanks, to which Bunzell replied "No, we've had no problems with it. It's all good." This is clearly a misstatement of facts "susceptible of actual knowledge" -- indeed, Bunzell's name was listed on the "For Sale" sign at the station: presumably, it would be his responsibility to be informed about the history of the particular station he was selling. -27- Relying on an Odometer Act case applying Georgia law, see Huycke v. Greenway, 876 F.2d 94, 95 (11th Cir. 1989), Sun ___ ______ ________ next argues that the Damons did not meet their burden of proving intent to defraud. In fact, however, "Massachusetts law does not . . . require an intent to deceive, let alone an intent to deprive the plaintiff of money, to prove misrepresentation." Bond Leather Co., 764 F.2d at 937 (citation omitted). ________________ "[A] long line of [Massachusetts] cases [establishes] that 'the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made as of the party's own knowledge, which is false; provided the thing stated is not merely a matter of opinion, estimate or judgement, but is susceptible of actual knowledge; and in such a case it is not necessary to make any further proof of an actual intent to deceive.'" Sperry, 333 N.E.2d at 428 (quoting Powell v. Rasmussen, 243 ______ ______ _________ N.E.2d 167, 168 (1969) (quoting Chatham Furnace Co. v. Moffat, 18 ___________________ ______ N.E. 168, 169 (Mass. 1888))); see Roadmaster Indus., Inc. v. ___ ________________________ Columbia Mfg. Co., 893 F. Supp. 1162, 1176 (D. Mass. 1995); ___________________ Zimmerman, 575 N.E.2d at 74.2 The Damons have met this burden _________ of showing that the Sun representatives made a misrepresentation of facts susceptible of actual knowledge, and so they have met  ____________________ 2 While the decision Bond Leather Co. v. Q.T. Shoe Mfg. Co. _________________ ___________________ notes that, contrary to Sun's contention, an intent to deceive need not be proven, it also reads Sperry as requiring an "intent ______ that the plaintiff rely on the challenged false statements." 764 F.2d at 937. We have found no case law supporting that contention. Nonetheless, we note that it is a reasonable inference that the representations made by Sun's representatives to a known potential buyer were made with the intent that the Damons rely on the statements. -28- their burden as to intent. Sun maintains that the district court failed to find that Sun intended the plaintiffs to rely on the misrepresentations.3 Federal Rule of Civil Procedure 52(a) mandates that courts "find the facts specially and state separately [their] conclusions of law thereon" when trying facts without a jury. See, e.g., Monta ez v. Bagg, 510 N.E.2d 298, 300 ___ _____ ________ ____ (Mass. App. Ct. 1987) (noting that judge did not make detailed findings of fact regarding chapter 93A claims under Mass. R. Civ. P. 52(a)). However, "the judge need only make brief, definite pertinent findings and conclusions on the contested matters." Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. _____ _________________________ 1987). Here, while it did not explicitly discuss intent, the district court set out the elements of the tort of misrepresentation, and found that Sun's representatives made the statements, that they were not opinions, and that Laubinger at least knew about the spill when he made his statement. In short, although the district court did not spell out every pertinent point, it is clear that it has provided us with more than mere  ____________________ 3 Sun contests that the district court's statement that "it should have been clear from Damon's questions that he was concerned about the past and future integrity of the entire underground gas delivery system" (District Court Findings of Fact and Conclusions of Law, at 7 n.1), implies that Sun did not in fact know what Damon asked about, and so no intent is demonstrated on this record. However, we refuse Sun's invitation to read this implication into the district court's statement, especially as, in its findings of fact, the district court specifically found that Damon had asked each of the representatives about past conditions, particularly regarding the underground tanks.  -29- conclusions.  C. Reasonable Reliance C. Reasonable Reliance ___________________ Sun's final attack on the evidence centers on the element of reasonable reliance. See Elias Bros. Restaurants v. ___ _______________________ Acorn Enters., 831 F. Supp. 920, 922 (D. Mass. 1993) (noting that _____________ the reliance element of the tort has been defined as requiring that it be reasonable). First, it states that the district court was silent on reasonable reliance. To the contrary, although it did not address the reasonableness of the reliance, the district court found that Damon "would not have purchased the station for $90,000 if he had been aware of the 1974 spill." (District Court Findings of Fact and Conclusions of Law, at 8).  Sun points to the fact that the Damons had the right to inspect the property prior to sale and did not do so as vitiating any argument of reasonable reliance, especially given Damon's acknowledged awareness of environmental issues. However, it is well established under Massachusetts law that "failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation." Bond Leather Co., 764 ________________ F.2d at 936. To find that the Damons' failure to investigate effectively bars their claim, as Sun requests, would run counter to the established case law on that point. "Only reliance on 'preposterous or palpably false' representations vitiates a misrepresentation claim." Roadmaster Indus., Inc., 893 F. Supp. ________________________ at 1179 (quoting Zimmerman, 575 N.E.2d at 76). Sun's _________ representations cannot be so characterized. -30- Sun's reliance on Maloney v. Sargisson, 465 N.E.2d 296 _______ _________ (Mass. App. Ct. 1984), is misplaced. There, the Maloneys bought property, and subsequently discovered that because of a drain line to a local reservoir, it could not be built on. Sargisson was the attorney with whom they entered the purchase and sale agreement. That agreement was made contingent on the land passing a percolation test and deep hole test to qualify for a building permit, with the tests to be done at the buyers' expense. The tests were done, indicated positive results, and the sale went through. Later, however, it turned out that the tests were done at the wrong time of year, and the results of the second deep hole test were adverse. The Maloneys sued Sargisson alleging, among other things, misrepresentation. The Appeals Court found that the Maloneys could not have relied on Sargisson's statements that "he knew all there was to know about the property," that they did not need to hire a lawyer, and that "the lot was a good building lot":  Whatever those alleged statements may be taken to mean, the Maloneys would not have relied upon them to their detriment so far as they might have borne on the capacity of the lot to pass soil tests . . . . Concerning that aspect of the land's character, their affidavit discloses, the Maloneys made their own examination. Id. at 301. ___ Clearly, Maloney is distinguishable from the present _______ case. There, the buyer specified in the agreement that it would make the tests, and did so. A district court had found that -31- there was no evidence Sargisson knew or should have known of the existence of the problem, a finding which carried weight as prima facie evidence in the superior court and was not questioned by the Appeals Court. Id. at 300. There is no indication that ___ Sargisson made a representation as to the status of the soil: rather, it is clear that the Maloneys relied on their own tests. Here, the questions went to the past history of the property, not just the present condition. In short, the reasoning in Maloney _______ is based on a sufficiently different set of facts such that Sun's reliance on it fails.4 See Roadmaster Indus., Inc., 893 F. ___ ________________________ Supp. at 1179 (holding that plaintiff buyer's failure to investigate contamination of soil at manufacturing plant as to matters of public record did not vitiate its misrepresentation claim). D. Factual Conclusions D. Factual Conclusions ___________________ Sun makes the additional argument that the district court made factual findings, where the facts were controverted, without explaining the reasoning for its determination.5 See ___  ____________________ 4 Sun's reliance on Rhode Island Hosp. Trust Nat'l Bank v. _____________________________________ Varadian, 647 N.E.2d 1174 (Mass. 1995), a promissory estoppel ________ case, is similarly misplaced. There, the court found that since the evidence did not warrant a finding that a promise in the contractual sense was made, reliance by the experienced businessmen plaintiffs would be unreasonable as a matter of law. Id. at 1179. We fail to see how that case sheds any light on the ___ misrepresentation charge here, where the court has found that a misrepresentation was indeed made.  5 Sun also contends that several of the district court's findings were irreconcilable and contradictory. As we address those allegations elsewhere in the opinion, we do not discuss them here. -32- Fed. R. Civ. P. 52(a) (mandating that court "find the facts specially and state separately its conclusions of law thereon" when trying facts without a jury). "To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. The court must support its rulings by spelling out the subordinate facts on which it relies." U.S. for the Use ________________ of Belcon, Inc. v. Sherman Constr. Co., 800 F.2d 1321, 1324 (4th ________________ ___________________ Cir. 1986) (vacating decision and remanding where district court made no finding on extent of plaintiff's responsibilities where the conflict "turn[ed] upon [the parties'] respective duties"). Our examination of the findings Sun questions reveal no error by the district court.6 First, Sun questions the credence the district court placed in Damon's testimony. Specifically, it argues that it should be provided with an explanation of why the court "disregarded the uncontroverted testimony of Mr. Damon that the station, the underground tanks, and the soil was '100% clean' in 1980 when Getty examined the station." (Appellant's Brief, at 40). Sun's phrasing twists the testimony: Damon testified that Getty told him the soil was clean, not that he knew it to be true. As we have already noted, Sun has not provided any evidence that Getty was in fact testing the soil: the district court specifically found that Getty was testing the tanks for  ____________________ 6 Two of Sun's contentions, that the district court's findings are insufficient as to intent and reliance, and that it did not adequately address the factual basis for Cataldo's exert opinion on the property's condition, have been addressed elsewhere in the opinion. -33- tightness. The district court stated during closing arguments that it also did not consider that Damon had made an admission that the property was clean.  Sun also argues that the court had to explain why it chose the "version" of his story Damon told at trial, instead of what it deems "varying" earlier versions under oath, especially as regards what questions he put to the Sun representatives. Our review of the record does not indicate that Damon's testimony at trial was so inconsistent with his earlier testimony as to constitute "'unsupported self-serving testimony that flies in the teeth of unimpeachable contradicting evidence and universal experience.'" Venturelli, 850 F.2d at 833 (quoting Insurance Co. __________ _____________ of North Am. v. Musa, 785 F.2d 370, 374-75 (1st Cir. 1986)). _____________ ____ Indeed, the district court stated that it did not "look upon them as being that different. There are differences, there's no question, but the extent of the differences is a difficult question, it strikes me." (Day 4, page 17).  Lastly, Sun contends that the court did not provide an evidentiary basis for its conclusion, made in a footnote, that "it should have been clear" to Sun what Damon meant in his questioning. The findings here, however, are not like the inconsistent and contradictory findings in Lyles v. United _____ ______ States, 759 F.2d 941, 944 (1st Cir. 1985), cited by Sun. The ______ court here specifically stated in its findings of fact that Damon asked both Laubinger and Bunzell about past problems. In connection with its comment that Sun's representatives should -34- have understood the scope of Damon's questions, the district court cited his testimony that "the only thing you've got in a gas station is tanks and pumps and the lines. I mean, what else is there?" (District Court Findings of Fact and Conclusions of Law, at 7 n.1). A "judge need only make brief, definite pertinent findings and conclusions on the contested matters." Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. _____ ________________________ 1987). The district court met its burden here.  CALCULATION OF DAMAGES CALCULATION OF DAMAGES The district court calculated the damages for the tort claim as $245,000, the difference between the actual value of the Damon's property if it was uncontaminated -- $600,000 -- as the defendant's representatives stated and the actual value of the property as contaminated -- $325,000 -- as measured when the plaintiffs sold the property to Rooney in 1992.7 Sun does not contest the district court's basic measurement, but argues that it should have set off specific monies against the purchase price, and should have accounted for the Damons' obligation to mitigate damages. We disagree, for the following reasons.  First, Sun contends the value of the indemnity Rooney gave the Damons from and against all environmental liability, which it suggests is approximately $104,000, should have been set  ____________________ 7 Adopting the sale price suggested by Rooney's gasoline supplier, the district court found the fair market value of the property if it had been not been contaminated to be $600,000. It took the actual sale price as the measure of the value of the property as contaminated: Rooney assumed the $325,000 of the Damons' first and second mortgages, $10,000 in arrears, and made a $20,000 cash payment, for a total of $355,000. -35- off against the purchase price. However, as the Damons point out, if Sun had not made the misrepresentation, the Damons would not be responsible to clean up the mess. Had the Damons cleaned up the property themselves, they would be entitled to reimbursement, and, presumably, the sale price of the property would have been higher: reducing the damages by the value of the indemnity would virtually reverse this process. Second, Sun argues that $40,000 should be taken off the damage figure, as the Damons did not give Rooney $40,000, as they were required to per their agreement, to defray costs of contamination. Again, if Sun's representatives had not misrepresented the property's condition, the Damons would not have owed that money to Rooney; if they had paid it to Rooney, it would have been added to, not offset against, the damages (and presumably would be reflected in the actual sale price). Third, Sun argues that $29,000 in back rent from Rooney should have been offset as well, since the Damons did not seek it from him. However, once again, the plaintiffs would not have lost that money without the misrepresentation. Also, according to paragraph 9 of the Agreement and Lease, Rooney was entitled to opt out of his lease if a governmental authority prevented him from occupying or using the property as a gasoline station. Thus, it is unclear that Rooney did, in fact, owe the past rent. Sun also argues that the Damons failed to mitigate their losses by not seeking back rent from Rooney. In light of the terms of the Agreement and Lease between Rooney and the -36- Damons, the fact that the Damons were obligated to pay Rooney $40,000, which they did not, and the subsequent sale of the property, we are hard put to accept their reasoning. For the above reasons, the district court's determination of damages is affirmed. CHAPTER 93A CLAIMS CHAPTER 93A CLAIMS The district court found that Sun's actions were "unfair or deceptive" and thus violated Massachusetts General Laws chapter 93A, section 11. At the same time, the lower court refused to award multiple damages under section 11, on the basis that "the evidence of bad faith or willful intent to deceive [was] insufficient to merit a punitive award." (District Court Findings of Fact and Conclusions of Law, at 12). See Mass. Gen. ___ L. ch. 93A, 11 (allowing multiple damages if "the use or employment of the . . . act or practice was . . . willful or knowing"). Sun argues on appeal that the court erred in finding it violated chapter 93A, while the Damons contend that the court erred in refusing multiple damages. For the reasons discussed below, we affirm the district court's finding that Sun was liable under chapter 93A, as well as its refusal of multiple damages. A. Sun's Liability Under Chapter 93A A. Sun's Liability Under Chapter 93A _________________________________ 1. Standard of Review 1. Standard of Review __________________ We begin our analysis by reciting our standard of review. The district court's findings of law face de novo ________ review, and its findings of fact engender clear error review. See Industrial Gen. Corp. v. Sequoia Pacific Sys. Corp., 44 F.3d ___ _____________________ __________________________ -37- 40, 43 (1st Cir. 1995). We deem a finding of fact to be clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. at ___ 43 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 ________ ______________________ (1985) (citation omitted)).  -38- 2. The Legal Framework 2. The Legal Framework ___________________ The district court found that Sun's actions were "unfair or deceptive" within the scope of chapter 93A. Section 11 provides a cause of action to  [a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment of another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice . . . . Mass. Gen. L. ch. 93A, 11; see Mass. Gen. L. ch. 93A, 2 ___ (establishing that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful). Common law misrepresentation claims provide a basis for liability under section 11. See, e.g., Sheehy v. Lipton Indus., Inc., 507 N.E.2d ___ ____ ______ ___________________ 781, 785 (Mass. App. Ct. 1987).  Section 11 does not define what conduct rises to the level of an "unfair or deceptive" act. See Cambridge Plating ___ __________________ Co., slip op. at 38-39. In weighing whether a defendant's ___ conduct meets the statute's requirements, "a common refrain has developed. 'The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'"8 Quaker State Oil ________________  ____________________ 8 The Damons argue that in Massachusetts Employers Ins. Exch. v. __________________________________ Propac-Mass, Inc., 648 N.E.2d 435 (Mass. 1995), the SJC abandoned _________________ the "rascality test" in stating that it "view[s] as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness'." Id. at 438. Contrary to the Damons' ___ interpretation, the SJC was simply recognizing that the mentioned phrases do not, despite their frequent citation, lend much guidance in the fact-specific context of a chapter 93A claim. -39- Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. __________ ________________ 1989) (quoting Levings v. Forbes & Wallace Inc., 396 N.E.2d 149, _______ _____________________ 153 (Mass. App. Ct. 1979)). In other words,  a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous" . . . .  Id. (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d ___ _________________ ___________________ 915, 917 (Mass. 1975)); see Tagliente v. Himmer, 949 F.2d 1, 7 ___ _________ ______ (1st Cir. 1991). As the SJC recently stated, in weighing an act's fairness, the focus is "on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors." Massachusetts Employers Ins. Exch., 648 N.E.2d __________________________________ at 438. 3. Sun's Violation of Chapter 93A 3. Sun's Violation of Chapter 93A ______________________________ In its challenge to the district court's finding that Sun is liable under section 11, Sun maintains that its conduct was not "unfair or deceptive." However, its argument on that basis is conclusory at best: Sun points to neither evidence in the record nor case law which would cast into doubt the district court's factual determination on that point.9 As neither Sun  ____________________ See Cambridge Plating Co., slip op. at 39.  ___ _____________________ 9 Sun does cite to evidence that Damon was a businessmen who had sold gasoline and used underground storage tanks for some thirty years prior to buying the property, but only to maintain that the court must apply a "heightened standard of an unfair or deceptive act or practice." We remind Sun that "[s]ophistication of the parties is not mentioned in chapter 93A and the amendment of chapter 93A to cover business entities did not limit the -40- nor our review of the record provides us with grounds to find the district court erred, we affirm the lower court's application of section 11. See Schwanbeck v. Federal-Mogul Corp., 578 N.E.2d ___ __________ ___________________ 789, 803 (Mass. 1991) (noting that "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact"), rev'd on other grounds, 592 N.E.2d 1289 ________________________ (Mass. 1992). Sun does look to Winter Panel Corp. v. Reichhold ___________________ _________ Chems., Inc., 823 F. Supp. 963 (D. Mass 1993), for support. _____________ There, plaintiff alleged that the defendant chemical supplier made false statements about its ability to supply the plaintiff with chemicals. Sun acknowledges that the Winter Panel court ____________ noted that "[k]nowing non-disclosure of information necessary to make affirmative statements complete or non-misleading will give rise to an action for misrepresentation, including an action under chapter 93A." Id. at 975. Sun nonetheless seeks to save ___ itself from liability by reliance on the court's additional statement that "[s]imply neglecting to discuss [defendant's representatives'] lack of practical experience with the precise methods of production pursued by Winter Panel, however, does not at present seem to be the kind of knowing omission that achieves  ____________________ statute's protection to small, unsophisticated businesses." V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 418 (1st Cir. ____________________ ____________ 1985). Regardless of the level of the parties' sophistication, we apply the well-developed standard for section 11 actions between two persons engaged in business. Of course, their relative levels of sophistication may enter into the fact-based analysis the court carries out in weighing whether a party's act was unfair or deceptive. -41- the level of rascality necessary to find a violation of chapter 93A." Id. As we have already affirmed the district court's ___ finding of misrepresentation, it is manifest that Sun's acts sink below the level of "simply neglecting to discuss" the 1974 contamination. Winter Panel offers Sun no relief. ____________ Sun's primary argument against the district court's holding blurs the line between section 11 liability and multiple damages.10 Specifically, it contends that since the district court apparently found Sun's conduct was not willful and knowing, Sun cannot have engaged in common law fraud. Since it could not have engaged in fraud, it concludes, its conduct did not rise to the level of intentional misconduct, beyond mere negligence or inadvertence, that section 11 demands.  We disagree. As noted above, the district court refused to award multiple damages here on the basis that  [m]ultiple damages are not mandated when misrepresentation occurs. Only "callous and intentional violations" deserve multiple damages treatment. In this instance, we believe the evidence of bad faith or willful intent to deceive is insufficient to merit a punitive award of multiple damages.  ____________________ 10 Sun also makes the circular argument that if its conduct amounts to negligence, it has not met the requirement of rascality needed for section 11, since negligence cannot be the basis for a section 11 violation. To the contrary, negligence can provide the basis for chapter 93A liability, so long as it is paired with an unfair or deceptive act or practice -- in other words, negligence plus rascality equals liability. See Squeri, ___ ______ 588 N.E.2d at 24; Glickman v. Brown, 486 N.E.2d 737, 741 (Mass. ________ _____ App. Ct. 1985); see, e.g., Briggs v. Carol Cars, Inc., 553 N.E.2d ___ ____ ______ ________________ 930 (Mass. 1990) (upholding application of sections 2 & 9 of chapter 93A where defendant made reckless misrepresentation).  -42- (District Court Findings of Fact and Conclusions of Law, at 12 (citations omitted)). As Sun itself indicates, reading the district court opinion as finding that Sun was not at all knowing or willful is inconsistent with the first element of the tort of misrepresentation, i.e. that a party make a false representation with the knowledge of its falsity. See Barret Assocs., Inc., 190 ___ ____________________ N.E.2d at 868. We understand the district court opinion as indicating that there was evidence of bad faith and willful intent to deceive, but that some quantum of knowing or willful violation must be met before a party is entitled to punitive damages under chapter 93A. Indeed, "shades of culpability are supposed to matter in applying the punitive damages provision in the statute." Cambridge Plating Co., slip op. at 42. Our ______________________ reading is consistent with the district court's specific finding that when Damon asked Laubinger if Sun had experienced any problems with the station and underground tanks, Laubinger replied that it was a "good station," despite his knowledge of the 1974 contamination. Cf. VMark Software, 642 N.E.2d at 596 ___ ______________ n.15 ("We put great stock in the findings of the trial judge on issues such as intent and motivation, since he was in a superior position to assess the weight and credibility of the witnesses, and there is no showing that his findings were clearly erroneous."). The case law supports this reading. In VMark Software, _______________ Inc. v. EMC Corp., cited by the district court, the trial court ____ _________ found VMark guilty of misrepresentation, but did not grant EMC -43- multiple damages under section 11. EMC claimed that the scienter requirement for the tort of misrepresentation automatically triggered section 11's mandatory doubling of damages for a knowing violation of chapter 93A. The court disagreed, finding that although VMArk's misstatements were made with sufficient awareness of the facts for it to be liable under the traditional tort formula, "they were not made so 'knowingly' as to warrant the punitive sanctions of double damages under c. 93A." Id. at ___ 595. We recently reaffirmed that "[l]iability under Chapter 93A for conduct amounting to intentional misrepresentation does not automatically trigger punitive damages. There must be something more." Cambridge Plating Co., slip op. at 42. Accordingly, the _____________________ district court's conclusion that Sun's actions were not knowing and willful enough to require punitive damages is not inconsistent with intentional misrepresentation. 4. Multiple Damages Under Chapter 93A 4. Multiple Damages Under Chapter 93A __________________________________ Paragraph 5 of section 11 provides for multiple damages where "the court finds that the use or employment of the . . . act or practice was a willful or knowing violation." The Damons argue that they should have been granted multiple damages, but do not contend that the district court should have found Sun's violation sufficiently willful or knowing to require double damages.11 Instead, they base their position on the premise  ____________________ 11 In their statement of conclusions, the Damons do posit that we should conclude that the district court's indication that Sun was guilty of some level of bad faith or willful intent to deceive suffices to require multiple damages under section 11, para. 5. However, as they offer no support for this contention, -44- that we should essentially read into section 11 the provision of section 9 which awards multiple damages for a defendant's bad faith refusal to make a reasonable settlement offer after demand.12 Their argument relies on the fact that sections 9  ____________________ we deem it waived. See United States v. Zannino, 895 F.2d 1, 17 ___ _____________ _______ (1st Cir.) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), cert. denied, 494 U.S. 1082 (1990). ____________ 12 That section provides, in pertinent part: Any person receiving . . . a demand for relief who . . . makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be . . . up to three but not less than two times [actual damages] if the court finds that . . . the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.  Mass. Gen. L. ch. 93A, 9(3). By comparison, section 11 states, in pertinent part: The respondent may tender with his answer . . . a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages. Mass. Gen. L. ch. 93A, 11. -45- and 11 share the goal of promoting reasonable settlement offers. See International Fidelity Ins. Co. v. Wilson, 443 N.E.2d 1308, ___ ________________________________ ______ 1318 (Mass. 1983). According to this logic, to further the statute's goals we should punish defendants who are liable under section 11 and who do not offer single damages with their Answer by inflicting multiple damages on them, and reward those who do with single damages.  We have previously noted that "[i]t is unclear whether section 11 permits recovery of multiple damages under such a theory where bad faith is proved." Southworth Mach. v. F/V Corey ________________ _________ Pride, 994 F.2d 37, 40 (1st Cir. 1993). Nonetheless, we do not _____ hesitate in refusing the Damons' argument. First, we note that section 9 is by its terms inapplicable to transactions between persons engaged in business, and section 11 quite simply does not include language acting as a counterpart to section 9's requirement of multiple damages where a party does not make a written tender of settlement. See id. Second, we note that, ___ ___ although it shares specific goals with section 9, "[s]ection 11 provides a different procedure for achieving the same objectives of facilitating settlement and fixing damages." Nader v. Citron, _____ ______ 360 N.E.2d 870, 874 (Mass. 1977). Indeed, the Massachusetts and federal courts have consistently respected the differences in procedures between the two sections. See, e.g., Fickes v. Sun ___ ____ ______ ___ Expert, Inc., 762 F. Supp. 998, 1001 (D. Mass. 1991); Aetna _____________ _____ Casualty and Surety Co. v. State Park Ins. Agency, Inc., 428 _________________________ ______________________________ N.E.2d 376, 377 (Mass. App. Ct. 1981); see also Glickman, 486 _________ ________ -46- N.E.2d at 742 & n.7 (refusing to analyze section 11 damages in terms of defendants' response to plaintiffs' demand letter). "Whatever the merits of implying the demand letter scheme of 9 into 11, as urged by defendants, we find no support for such implication in the language and structure of 11." Nader, 360 _____ N.E.2d at 874. Finally, we note that the district court did not find that Sun's failure to tender an offer of settlement was "made in bad faith with knowledge or reason to know that the act or practice complained of violated said section 2," as section 9 demands, and the Damons have not demonstrated any evidence to the contrary. Thus, even if we were to weigh Sun's failure to tender an offer into our analysis, the Damons' challenge to the court's damage award would fail. Our decision today does not clash with the SJC's decision in International Fidelity Ins. Co., despite the Damons' ________________________________ reliance on it. There, the SJC weighed the goal of promoting reasonable settlements in both sections 9 and 11, and found that it would be appropriate to impose independent liability against the multiple defendants in that case, as to do so would promote settlements. 443 N.E.2d at 1318. At the same time, however, the Court noted that "the procedures set out in the two sections differ," despite their common goal. Id. (citing Nader, 360 ___ _____ N.E.2d at 870). Thus, we read International Fidelity Ins. Co. ________________________________ not as suggesting we read the damage provisions of section 9 into section 11, but as recognizing that their goals are similar while their methods are not. See Levings v. Forbes & Wallace, Inc., ___ _______ ______________________ -47- 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) ("The remedies and procedures in 9 and 11 are related, but not parallel, and the conditions of one section should not be read by implication into the other."); Nader, 360 N.E.2d at 874 (noting that "analogies, _____ whatever their utility, do not form a basis for the judicial rewriting of statutes" in refusing to read section 9's demand letter procedure into section 11). ATTORNEY'S FEES ATTORNEY'S FEES The district court awarded the Damons $40,620.40 in attorney's fees and costs. See Mass. Gen. L. ch. 93A, 11 para. ___ 6 (mandating reasonable attorney's fees and costs be awarded where the court finds a violation of 2). Sun argues that the award was not reasonable, on the basis that the hourly rates granted (specifically, the rate of $235 an hour for court appearances and depositions) were exorbitant and unreasonable, and the contingency nature of the engagement. Based on our review of the record, we do not find the court's award unreasonable. CONCLUSION CONCLUSION For the reasons discussed above, we find that the district court's refusal of Sun's motion for entry or judgment and motions to alter and amend the judgment and findings and for a new trial were not an abuse of its discretion. Having considered all the parties' arguments, we find both appeals to be lacking in merit. Consequently, we affirm the decision of the ______ district court on all points.  -48- No costs on appeal to either party. -49-