In re Catherine Lawson MICHEL, Debtor.

UmbrellaBank, FSB, Plaintiff,

v.

Catherine Lawson Michel and Victor W. Dahar, Trustee, Defendants.

Bankruptcy No. 01–12121–MWV.
Adversary No. 01–1171–MWV.

United States Bankruptcy Court, D. New Hampshire.

Jan. 9, 2004.

Charles J. Filardi, Pepe & Hazard, LLP, Southport, CT, Joshua W. Cohen, Patrick J. Day, Cummings & Lockwood LLC, Stamford, CT, John M. Sullivan, Preti, Flaherty, Beliveau, Pachios & Haley, Concord, NH, for Plaintiff.

William S. Gannon, Law Offices of William S. Gannon PLLC, Manchester, NH, for Debtor–Defendant.

### MEMORANDUM OPINION

MARK W. VAUGHN, Chief Judge.

The Court has before it the complaint of Plaintiff, UmbrellaBank, FSB, f/k/a ARGO Federal Savings Bank, FSB (hereinafter "UmbrellaBank"), against the Debtor–Defendant, Catherine Lawson Michel (hereinafter "Michel"), seeking that the debt owed to it be excepted from discharge pursuant

to sections 523(a)(2)(A) and (B), 523(a)(4) and 523(a)(6). At trial, the Plaintiff stipulated to the dismissal of the 523(a)(2)(B) count, and that is no longer before the Court. The Court previously, on October 21, 2002, granted the Plaintiff's motion to dismiss the Defendant's first counterclaim in its entirety. The Court held a three-day trial. In rendering this opinion, the Court has reviewed the transcript of that trial as well as the evidence submitted.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## FACTS

Prior to December 1999, Michel resided in Henderson, Nevada. Through her employment with the National Association of Mortgage Bankers, she had become acquainted with Ralph Rosynek, who, in December 1999, was the senior lender and senior vice president for UmbrellaBank. Prior to December 1999, 464,584 shares of stock in eVentures Group, Inc. ("eVentures") had been issued to Michel's husband, Robert, as evidenced by stock certificate no. 5013 (Pl.'s Ex. 20). The shares were issued in a private transaction, were not registered and were restricted from being sold to the public until September 21, 2001. A legend to that effect was attached to the back of the certificate. In December 1999, Michel inquired of Rosynek whether his bank would lend her and her husband money secured by these restricted shares. On December 15, 1999, Michel faxed a copy of the certificate and a Yahoo! statement of value of the shares on the public market of $13,472,936 (Pl.'s Ex. 19). UmbrellaBank then agreed to loan the Michels $500,000. On December 21, 1999, Michel and her husband executed a note for $500,000 (Pl.'s Ex. 6) and a stock pledge and security agreement (Pl.'s Ex. 7). The note matured on December 31, 2001, and provided for monthly payments of interest only prior thereto. The stock pledge and security agreement contained the following provisions:

2. Grant of Security. As security for the due and punctual payment of the Obligations (as hereinafter defined in Paragraph 3), Grantor hereby grants, assigns, pledges and transfers to lender, a security interest in all of his right, title and interest in and to shares of common stock of Corporation, that are delineated on Schedule A attached hereto and made a part hereof, whether now held or hereafter acquired (the "Stock Interests"), together with any certificate evidencing such Stock Interests and all income therefrom, distributions with respect thereto (whether in the form of cash, instruments or property) and proceeds thereof and any rights appurtenant thereto, including, without limitation, any voting rights (hereinafter collectively referred to as the "Collateral"). GRANTOR AGREES TO DELIVER AND PLEDGE AT ALL TIMES UNDER THIS SECURITY AGREEMENT STOCK INTEREST HAVING A MARKET VALUE EQUAL TO OR IN EXCESS OF 200% OF THE OUTSTANDING BALANCE OF THE NOTE. UPON TEN (10) BUSINESS DAYS WRITTEN NOTICE GRANTOR SHALL DELIVER AND PLEDGE SUCH ADDITIONAL STOCK INTERESTS TO MAINTAIN THIS RATIO WITHIN TEN (10) BUSINESS DAYS OF WRITTEN DEMAND FOR SAME

FROM LENDER. GRANTOR'S FAIL-URE TO DELIVER SUCH ADDI-TIONAL STOCK INTERESTS SHALL BE A DEFAULT HEREUN-DER.

. . . .

11. Transfers and Other Liens. · The Grantor shall not:

(i) Sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral; or

(ii) Create or suffer to exist any lien, security interest or other charge or encumbrance upon or with re-spect to any of the Collateral.

. . . .

19. Amendments. No amendment or waiver of any provision of this Agree-ment nor consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(Decl. of UmbrellaBank, Stock Pledge and Sec. Agt., Pl.'s Ex. 7). Schedule A is as follows:

SCHEDULE A

*Grantor*

Shares of Stock of

| | |
|---|---|
| Robert L. Michel and Catherine L. Michel | 464,584 Shares of Common Stock, $.00002 par value represented by Certificate number 5013. |

(Decl. of UmbrellaBank, Sch. A to Stock Pledge and Sec. Agt., Pl.'s Ex. 7). Al-though there was no requirement in the loan documents, the Michels opened a money market account at UmbrellaBank

To Robert and Catherine Michel, jointly:
To Robert:
To Catherine:
To deReu
To Steve Michel:
To Norika Michel:

from the loan proceeds in the amount of $50,000 and purchased a certificate of de-posit in the amount of $50,000. These accounts were opened to facilitate the monthly payment of interest to Umbrella-Bank, although there were no restrictions on these accounts to be used for any other purposes.

After the loan was funded, Michel em-barked on a quest for parties who would purchase some or all of the restricted shares in a private transaction. In antici-pation of an agreement to sell 200,000 shares of stock that was being negotiated, Michel sent a letter to Rosynek on April 22, 2000, requesting the return of the stock certificate so that it could be delivered to the stock transfer agent to be reissued in multiple certificates. That letter included the following language:

This letter shall serve as notification of our intention to payoff our ARGO loan # 285005608 in the amount of $500,000.00 as part of a negotiated transaction for the sale of 200,000 shares of eVentures Group, Inc. stock.

(Pl.'s Ex. 25.) It also included the follow-ing:

Should the sale of our stock fall through for any reason, we promise to return sufficient shares of stock as specified within our original ARGO loan agree-ment for ARGO to hold as security until such time as the loan is repaid.

(Pl.'s Ex. 25.) By letter dated April 19, 2000, Robert Michel requested the stock transfer agent to issue the following shares:

200,000 shares
100,000 shares and 22,292 shares
100,000 shares and 22,292 shares
1 certificate for 10,000 shares
1 certificate for 5,000 shares
1 certificate for 5,000 shares

Apparently, new shares were issued in the names and amounts as requested. All of the transfers from Robert Michel were defined as gifts except the 10,000 shares to deReu, which were sold for an aggregate purchase price of $50,000. None of the proceeds from this sale went to Umbrella-Bank. None of the newly issued shares to Robert and Catherine, jointly, and/or individually, were returned to UmbrellaBank. The deal anticipated by the April 22, 2000, letter fell through.

On June 30, 2000, Michel and her husband each sold 100,000 shares to R.P. Ventures Capital Fund L.C. at a price of Three Dollars per share, or $300,000 to each. None of the proceeds were delivered to UmbrellaBank for payment of the principal amount. On October 13, 2000, Michel agreed to sell 22,292 shares to R.P. Ventures Capital Fund L.C. for a total purchase price of $79,415.25. For reasons that are unclear to the Court, Michel has only received $10,000 of the purchase price. None of the proceeds were delivered to UmbrellaBank.

Other than the April 22, 2000, letter, what communications existed between Michel and Rosynek are disputed. Michel testified that she e-mailed him in June 2000 (Def.'s Ex. 240) and spoke to him by telephone in August and December 2000. The purpose of these conversations, she alleges, was to keep him informed of the status of the shares. Rosynek disputes receiving the e-mail and defied that the telephone conversations did not occur. In April or May 2001, Rosynek became aware that the $500,000 loan was in default and commenced collection actions through UmbrellaBank's lawyer, J. Kemp. Upon receipt of the letter from Attorney Kemp, Michel contacted Rosynek and immediately returned the 100,000 shares that remained. However, by this time, the price of the shares had dropped to a point where they were essentially worthless. Evidently, UmbrellaBank still holds the shares.

### DISCUSSION

Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's "fresh start" policy, and, for that reason, the claimant must show that his "claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994); *see In re Bajgar*, 104 F.3d at 498 n. 1. The statutory requirements for a discharge are "construed liberally in favor of the debtor" and "[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987) (internal quotation marks omitted). On the other hand, we have noted that "the very purpose of certain sections of the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Id.* Likewise, other sections of the law, like § 523(a)(2)(A), are intended to make certain that bankruptcy protection is not afforded to debtors who have obtained property by means of a fraudulent misrepresentation.

. . . .

The standard of proof of each element of a § 523 claim is by a preponderance of the evidence. *Grogan [v. Garner]*, 498 U.S. [279] at 291, 111 S.Ct. [654] at 661[, 112 L.Ed.2d 755 (1991)]. The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of

a particular debt under Bankruptcy Code § 523. *See In re Burgess,* 955 F.2d [134] at 136 [(1st Cir.1992)]; *See also Insurance Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1120 (3d Cir.1995) (regarding § 523(a)(2)(B)).

*Palmacci v. Umpierrez,* 121 F.3d 781 (1st Cir.1997).

A. *Count I—523(a)(2)(A)*

■ Under the traditional common law rule, a defendant will be liable if (1) he makes a false representation, (2) he does so with fraudulent intent, i.e., with "scienter," (3) he intends to induce the plaintiff to rely on the misrepresentation, and (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage (pecuniary loss). 2 F. Harper, et al., Law of Torts § 7.1, at 381 (2d ed.1986); Restatement (Second) of Torts § 525 (1977).

*Id.* at 786. In order for a debt to be excepted from discharge under section 523(a)(2)(A), the debt must be "for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by ..." 11 U.S.C. § 523(a)(2)(A).

■ In the instant case, there is no allegation of any fraud or false representation in connection with the funding of the $500,000 loan in December 1999. The loan documentation was prepared by the Plaintiff, executed by the Defendant, including the pledge of the 464,584 shares, and funded by the Plaintiff. Thus, the false representation upon which the Plaintiff relies is contained in the April 22, 2000, letter from Michel to UmbrellaBank, specifically the representation that they intended to pay off the loan and the representation that if the deal fell through, they would return "sufficient shares of stock" to UmbrellaBank as security for the loan. As with most 523(a)(2)(A) cases, the inquiry starts

with the intent of the Defendant at the time the representation was made.

The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform,* then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made. *See, e.g., In re Anastas,* 94 F.3d [1280] at 1285 [(9th Cir.1996)]; *Milwaukee Auction Galleries Ltd. v. Chalk,* 13 F.3d 1107, 1109 (7th Cir.1994) (more than mere nonperformance of a contract was necessary to establish misrepresentation); *Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1410–11 (3d Cir. 1991) (same); *Craft v. Metromedia,* 766 F.2d 1205, 1219, 1221 (8th Cir.1985).

*Palmacci,* 121 F.3d at 787. Michel testified throughout the hearing that her understanding of the loan documents required that sufficient shares be pledged equal to two times the amount of the loan. She further testified that, although the entire 464,584 shares were pledged when the loan was funded, this was more a matter of convenience as there was only one certificate at the time, but she had discussed with Rosynek the concept of them sometime breaking up the certificate, at least to the extent of making gifts to her children. She further testified that until sometime in the winter/spring of 2001, she believed she always had sufficient shares to satisfy the loan requirements. In essence, it was the downturn in the telecommunications industry that prevented her from satisfying the requirements of the loan documents.

While the Court is aware that it must consider the totality of the circumstances concerning the representation when finding intent and that, in certain circumstances, subsequent behavior may be considered indicating the defendant's intent, the Court cannot find that the Plaintiff met its burden that the representation was made with the intent not to perform. In support of this, the Court finds Michel's testimony to be credible. Further, on two pieces of communications with possible purchasers, she indicated the existence of UmbrellaBank's lien. In an April 9, 2000, letter to Jim Frazier, she indicated "Current Stock Lien is $1,000,000.00 against a $500,000.00 loan with: ARGO Federal Savings Bank." (Pl.'s Ex. 109). In a May 25, 2000, stock loan sale application apparently sent to Infinity Finance Corp., she indicated the existence of the lien in paragraph 17, and in paragraph 22 concerning the use of the proceeds, she answered, "Pay off $500K Loan." (Pl.'s Ex. 120).

Subsequent to the trial, Plaintiff submitted a supplemental memorandum advising the Court of *In re Spadoni*, 316 F.3d 56 (1st Cir.2003) for the proposition that the Plaintiff's reliance was justified. However, in order to find for the Plaintiff in Count I, each element must be proven. Since the Court cannot find a requisite "scienter," the issue of justifiable reliance is never reached.

**B.  *Count II—523(a)(4)***

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . .

11 U.S.C. § 523(a)(4). Plaintiff asserts in its request for findings and conclusions that the stock pledge and security agreement "created an express trust as required by 523(a)(4)." This Court disagrees. The only trust language is in paragraph 8 of the agreement, which pertains to subsequent distributions made by the corporation—eVentures. That is not the situation here. Plaintiff further argues that Defendant is its agent and the relationship constitutes one of a fiduciary. Once again, the Court does not agree. While the Plaintiff may have imposed an agency relationship on the Defendant when it returned the shares, in this case it failed to do so. In essence, this was not the way to administer a loan secured by stock.

What is left under 523(a)(4) is embezzlement. To prove embezzlement under 523(a)(4), the following elements must be shown:

A.  The relevant property was rightfully in the possession of a non-owner;

B.  The non-owner appropriated the property for a use other than for which it was intended; and

C.  The circumstances indicate fraud.

*Osborne v. Rivela (In re Rivela)*, 2000 WL 33679411, 2000 Bankr.LEXIS 1805, 2000 BNH 001. At all times relevant to this case, the shares in question were owned by the Defendant and her husband. Since the shares, in fact, were owned by the Defendant, the return of the shares was not an "entrustment" to a non-owner and the subsequent sale of a portion of the shares was not an appropriation by a non-owner. While it is clear that a breach of contract existed, the transaction in question does not fit the elements of embezzlement. Count II is denied.

**C.  *Count III—523(a)(6)***

In Count III, the Plaintiff alleges the Defendant's sale of stock pledged

as collateral constituted conversion and that conversion equals willful and malicious injury to property. The Court agrees that wrongful disposition of collateral may constitute a conversion. Here, the Defendant knew that at least some shares were pledged, but she sold 100,000 shares for $300,000 and spent the proceeds for personal expenses, including gambling. None of the proceeds were used to reduce the principal of the $500,000 loan. The Defendant's justification is, once again, that at all times she believed she retained sufficient shares to satisfy the requirements of the stock pledge agreement and, thus, there could not be a conversion. The Court does not believe that this is a sufficient justification for the sale of 100,000 shares and the failure to remit any of the proceeds to reduce the principal of the loan. She obtained the shares on the representation that the loan would be repaid or the shares returned, which was not done. The Court finds that the Debtor converted at least a portion of the collateral of the Plaintiff.

■ However, on the facts of this case, does this conversion give rise to a finding of willful and malicious injury to property? Not all conversions are willful and malicious. The Court will not find that the conversion, in the facts of this case, give rise to an exception to discharge for willful and malicious injury to property. In the instant case, the Plaintiff voluntarily returned the shares to the Defendant by returning the shares without any evidence of its security interest fixed to the shares, which immediately put its security interest at risk. Having put it at risk, the Plaintiff did not take reasonable steps to enforce its interest. UmbrellaBank, in fact, had little or no communication with the Defendant for approximately one year after returning the shares. UmbrellaBank's failure to take reasonable steps to protect its collat-

eral prevents application of the willful and malicious exception. *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 518 (Bankr. M.D.Ga.2002) citing *In re Wolfson*, 56 F.3d 52, 55 (11th Cir.1995).

■ Further, the Plaintiff must prove that the Defendant intended to cause the harm to property or to the Plaintiff, in this case, the collateral. *Kawaauhau v. Geiger*, 523 U.S. 57 at 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Based on the Defendant's testimony that she at all times believed she had sufficient shares to satisfy the loan requirements, the Court cannot find that she intended to cause harm to the Plaintiff. Rather, an intervening cause, a downturn in the telecommunications industry, resulted in the failure of the value of the remaining shares to continue to satisfy the loan requirements. For the reasons stated herein, Count III is denied.

### CONCLUSION

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate final judgment consistent with this opinion.