In re John R. CALIRI, Debtor.

Stoy Hancock, Plaintiff,

v.

John R. Caliri, Defendant.

Bankruptcy No. 03–13854 JNF.
Adversary No. 03–1345.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 31, 2005.

Gary W. Cruickshank, Boston, MA, for Debtor.

**MEMORANDUM**

JOAN N. FEENEY, Bankruptcy Judge.

**I. INTRODUCTION**

The matter before the Court is the four-count Complaint filed by Stoy Hancock ("Hancock") against the Debtor, John R.

Caliri (the "Debtor" or "Caliri").[1] Hancock primarily seeks an order declaring that a debt he asserts is due from the Debtor in the sum of $33,940 arising from the Debtor's alleged conversion of vending machines and theft of money and products from the vending machines is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6). The Debtor filed an Answer to Hancock's Complaint in which he denied Hancock's allegations. The Debtor also filed a Counterclaim, which he did not pursue at trial.[2]

The Court conducted a trial at which 18 exhibits were introduced in evidence and five witnesses testified, including Hancock and Caliri. Based upon the testimony and documentary evidence, the Court makes the following findings of fact and conclusions of law as required by Fed. R. Bankr.P. 7052.

## II. FACTS

The Debtor filed a voluntary Chapter 7 petition on May 7, 2003. He failed to list Hancock as a creditor on Schedule F–Creditors Holding Unsecured Nonpriority Claims. Additionally, he failed to list his Counterclaim against Hancock on Schedule B–Personal Property, and he did not disclose pending litigation with Hancock in the Hingham District Court. Prior to the commencement of this adversary proceeding, the Debtor amended his Schedules and Statement of Financial Affairs to remedy these omissions. Additionally, he amended Schedule B to list ownership of an automobile, a 2002 Chevrolet Impala automobile which the Trustee sold for the benefit of creditors.

During 1999 and 2000, Caliri and Hancock worked together at Reservoir Nursing Home ("Reservoir") in Waltham, Massachusetts. Reservoir employed Caliri as its Food Services Director and Hancock as its Maintenance Director. In addition to employment by Reservoir, Caliri operated a vending business under the trade name, "Can Do Vending." During some portion of their tenure working together at Reservoir, Hancock and Caliri shared office space. In mid– to late–1999, Hancock, who was operating a janitorial business under the trade name, "Management Solutions," expressed to Caliri an interest in starting a vending business. The Debtor assisted Hancock in this endeavor, providing him with advice and recommendations about where he could purchase vending equipment and supplies. Hancock eventually established his own vending business under the trade name, "Thompson Vending." Hancock and Caliri worked together at Reservoir until early 2001 when Hancock accepted a job offer from Fran Herr ("Herr"), his supervisor at Reservoir, who had become an administrator at a facility known as Mariner Health at Longwood. It was around this time that the relationship between Hancock and Caliri deteriorated.

On September 22, 1999, Coca Cola delivered nine Coca–Cola vending machines to Reservoir's parking lot. So-called "Bottle/Can Equipment Move Orders" (the "Move Orders") generated by Coca–Cola, which were authenticated at trial by a Coca–Cola employee, Mary Curran, and entered in evidence, reflect the delivery of these nine machines to Reservoir. The Move Orders, which contain a variety of

---

**1.** Hancock sets forth the following counts in his Complaint: Count I (Conversion/Larceny); Count II (M.G.L. c. 93 § 11[sic] ); Count III Larceny (11 U.S.C. § 523(a)(4)); and Count IV Willful and Malicious Injury (11 U.S.C. § 523(a)(6)).

**2.** The Trustee did not file a Motion to Intervene in this adversary proceeding for purposes of pursuing the Counterclaim, which was an asset of the Debtor's estate.

different handwriting styles, set forth the equipment location as Reservoir Nursing Center or Reservoir Nursing Home, c/o Can Do Vending, and they set forth "John" and the Debtor's telephone number under billing location. On the forms, the type of contract is specified as a loan, and what purports to be the Debtor's signature appears on all nine documents. Caliri, however, denied signing the Move Orders, and the signature that purports to be his is notable for the misspelling of the last name. All the Move Orders contain the signature or facsimile signature stamp of Andrew Stennant, who is identified on the Move Orders as the sales center manager, district manager and key account manager for Coca Cola, as well as a date of September 20, 1999. As shown on the Move Orders, delivery of the vending machines to Reservoir occurred on October 1, 1999. A customer receipt signature appears on the Move Orders in the form of initials which, though barely decipherable, appear to be those of Hancock, rather than Caliri.

Hancock, who had unsuccessfully attempted to obtain vending machines from a Coca–Cola distributor in Lowell, Massachusetts, testified that Caliri called his sales representative at Coca–Cola–Braintree to arrange for the delivery of the nine machines to Reservoir, leaving a telephone message with his sales representative. Caliri testified that he made no such call and only learned about the existence of the nine machines in February of 2001 from fellow employees at Reservoir. Caliri testified that he did not arrange to have nine Coca–Cola vending machines delivered to Reservoir, and, furthermore, was not present when they were delivered. He testified that he did not sign the Move Orders and did not give anyone permission to sign his name. Caliri indicated that he had no idea how his name appeared on the Move Orders. In fact, he stated that the first time he saw the Move Orders was in his attorney's office one week before trial.

Herr, the former Administrator at Reservoir and both Caliri's and Hancock's superior, testified that Caliri approached her seeking permission to have the vending machines delivered to Reservoir. Because of the limited parking at the facility and the configuration of the driveway, she was concerned that the delivery truck might cause damage to the property and that prolonged storage of the machines would disrupt parking. She testified that Caliri assured her that the machines would be stored at the Reservoir facility for only a short period before being delivered elsewhere.

There was conflicting testimony about who was present when the nine machines were delivered. Herr thought that both Hancock and Caliri were present and assisted movers in loading the machines for delivery to elsewhere, but her testimony was vague. Caliri denied any knowledge of the delivery and subsequent move from Reservoir. Hancock testified that Herr was present when the machines were delivered but he could not remember if Caliri was present.

Although Herr's testimony was credible, she admitted offering Hancock a job at a nursing home where she worked after leaving Reservoir. Additionally, she obtained a loan from Hancock, which she stated had been repaid.

When the nine machines were delivered to Reservoir, Hancock claimed that Caliri arranged to have them picked up and delivered to Atlantic Union College using his account with Shea Trucking. According to Hancock, Caliri gave him the invoice so that he could pay Shea Trucking directly. An invoice from Shea Trucking was entered in evidence referencing the transaction. The invoice for $501 was billed directly to "Can Do Vending." Hancock

identified a check payable from his Management Solutions' account in the amount of $501, payable to Shea Trucking.

In addition to the nine Coca–Cola machines that were placed at Atlantic Union College, there was testimony about a coke machine and a snack machine located at Gateway Computer ("Gateway") in Framingham. In the parties' Joint Pretrial Memorandum, the Debtor admitted that he "transferred to Plaintiff the vending machine account at the Gateway Computer store in Framingham, Massachusetts." Hancock testified that he bought the Gateway snack machine, known as an AP [Automated Product] snack machine from Caliri. The transaction was documented with a check payable to Caliri drawn on Hancock's Management Solutions' account, dated December 3, 1999, in the sum of $2,000. A notation on the check reads: "AP snack from Can Do." Hancock testified that Caliri arranged with Shea Trucking to ship the snack machine from its storage facility to Gateway.

Although Hancock paid Caliri $2,000 for the snack machine in early December, 1999, the machine was actually shipped from Shea Trucking's storage facility to Gateway in early September, 1999. Hancock testified that the Debtor then gave him the invoice, and he paid Shea Trucking directly. A Shea Trucking invoice, numbered 3860, issued to Can Do Vending was submitted in evidence, as well as a check, dated September 13, 1999, in the sum of $95 drawn on Hancock's Management Solutions' account. The notation on the check reads: "Inv. 3860 Gateway."

Caliri, on the one hand, maintained that he sold Hancock only one vending machine for $2,000 and that he was aware that Hancock placed it at Gateway in Framingham. Hancock, on the other hand, testified that he bought two other snack machines from Caliri, for a total of three

machines. He introduced a check, dated June 10, 1999, payable to Caliri in the sum of $1,800, with a notation, "vending." Hancock testified that the machine he bought for $1,800 was a so-called combo machine, a Crane National machine, which dispensed both snacks and drinks. He placed the combo machine at a construction company known as ET & L Construction. According to Hancock, he paid cash for the third machine.

Hancock testified as to the locations of his snack and soda machines. In addition to the soda and snack machine at Gateway, from which he began collecting money on September 17, 1999, and the combo machine at ET & L Construction, from which he began reporting income on September 1, 1999, Plaintiff's Exhibit 13, a spreadsheet for Hancock's sales at various locations, reveals that Hancock had a soda machine at Leominster Crossing and began collecting monies from it as early as September 2, 1999. Beginning September 23, 1999, Hancock began reporting income from five snack machines at Atlantic Union College. Although he listed the nine soda or juice machines that were eventually delivered to Atlantic Union College from Reservoir, he did not report income from them until October 6, 1999. Sometime in late April 2000, Hancock placed machines at Billerica Crossing and reported income from a soda machine and a snack machine there beginning on April 28, 2000. Additionally, he began reporting income from a soda machine and a snack machine at Reservoir beginning the week of June 18, 2000.

Although Hancock's sales ledger inexplicably stopped in August of 2000 and did not resume until 2001, Hancock produced a ledger prepared by his wife beginning the week of December 31 through January 6, 2001 and continuing through the week of March 11 through Mach 19, 2001. From

Hancock's accounts, it appears that he moved the soda and snack machines from Leominster Crossing to Waltham Crossing in the late summer or fall of 2000. Hancock testified that "[t]he soda machine was originally ordered for another location out of the area, Leominster Crossing, by John Caliri, shipped out to that location by Spellman Trucking, and at the end of that account I moved it to their sister property at Waltham Crossing where I maintained it there."

Initially, Caliri assisted Hancock in obtaining products for his machines. In particular, Caliri had supplies delivered by SYSCO Food Services or Alliant Foodservices, Inc. to Reservoir for use in stocking their snack machines. Hancock testified that he initially purchased snack products directly from the Debtor. According to Hancock, Caliri would place orders for snacks from Reservoir's account for a discounted price. Caliri paid the invoices and Hancock reimbursed him after the orders were delivered. For example, an invoice dated September 16, 1999 from Alliant Foodservice, Inc. was entered into evidence. The order was billed to Reservoir, and the total price was $133. Hancock offered a check, dated October 11, 1999, in the amount of $133, in evidence. The check was drawn on his Management Solutions' account and was payable to "Can Do Vending." He also offered in evidence a snack order invoice dated October 14, 1999 from SYSCO Food Services. The invoice, totaling $226.48, was billed to Reservoir. Hancock testified that he shared this order with Caliri and offered in evidence a check payable to Caliri, dated December 9, 1999, in the amount of $95.27 from his Management Solutions' account. The check contained a reference the SYSCO invoice number.

Hancock also testified that Caliri gave him stickers with the "Can Do Vending"

logo and telephone number to place on his vending machines. He further testified that during the initial start up of his business, he did not have a cellular telephone or the money to engage an answering service. He indicated that Caliri thought that it would be a good idea for him to place the stickers on his vending machines so that, if repairs were needed, customers could contact him using the telephone number on the sticker. Hancock stated that Caliri gave him enough stickers to place on all of the machines located at Atlantic Union College. Hancock described the arrangement as follows:

> At that time I did not have a cell phone or a pager to be contacted at, and he [the Debtor] felt that it would be great for me to be able to use [the stickers] until I got my business set up completely, and he would refer service calls on to me and he did. . . .

> \* \* \* \* \* \*

> Mr. Caliri would just refer me to what person had left on his voice mail or pager.

> \* \* \* \* \* \*

> He would not have anything to do with them [the callers]. He would just refer them to me and I would take care of the arrangements to get the equipment serviced.

Hancock also testified that he left the "Can Do Vending" stickers on his equipment for a period of 15–16 months as "a matter of convenience."

Caliri testified that he never arranged for Shea Trucking to transport any of Hancock's vending machines. He denied receiving invoices from Shea Trucking, and claimed that he did not forward any invoices to Hancock. Caliri also testified that he never gave Hancock permission to place stickers with the "Can–Do" logo on any machines and that he never fielded

any phone calls from Hancock's customers requesting service.

Hancock operated his vending business without incident until the beginning of 2001. As reflected on Plaintiff's Exhibit 12, however, his vending machine business, never reported a profit.

In February of 2001, Hancock stated that he received a telephone call from Caliri, in which Caliri demanded the return of various vending machines. Hancock described the telephone call as follows:

> The week prior, or a couple of days prior to me leaving to go get married, I received a phone call driving home from work, and it was Mr. Caliri stating that he wanted his machines back. The reason he wanted his machines back was because he could not get a vending machine installed at Reservoir Nursing Home, since I was leaving, and the reason why that was, was because he had the nine other machines delivered there and Coca–Cola was wanting to know why they needed a tenth machine delivered to a small building.

> In that conversation Mr. Caliri stated that he wanted them back right away. I explained to him that it would be very hard, due to the fact that I was leaving and going to get married the next weekend, and I would be out of town for a full week and—and to me, it was a threatening manner, he said, "Well, I want my machines back and I'm going to get them back," and then he hung up the phone.

> At that point I was a little fl—flustered and I wasn't sure what I was going to do. I needed to get some time to get some other machines back, and *since John had got them for me, he had the right to have them back,* but I needed time to get some machines from Coca–Cola Lowell, where I had at that time arranged an account there, and just on

the spur of the moment saying, "I want them back now" and not giving me a week to two weeks' time to get some other machines to re—to replace those machines wasn't sufficient enough.

(Emphasis supplied).

As a result of the Debtor's phone call, Hancock called his long-time friend, Gordon Moore ("Moore"), and instructed him to go to Atlantic Union College and empty the cash out of all of the machines located there. Hancock previously had given Moore the keys to the vending machines and needed him to empty the machines because he was leaving town to get married. Hancock told Moore that Caliri would be attempting to collect the money from the machines at Atlantic Union College. He also told Moore that the money was his and that he wanted Moore to get it. Moore went to Atlantic Union College and, after removing cash from several machines, encountered Caliri, who was already there. According to Moore, Caliri explained to him that the machines were his and that the money inside belonged to him as well. Caliri replaced the locks on the vending machines, which Moore had not emptied, and took possession of the cash, including the cash Moore had collected, as well as the soda in all the machines. Caliri gave Moore the locks which had been placed on the machines by Hancock.

Caliri denied making a phone call to Hancock demanding his machines back and, instead, testified that he placed a call to Coca–Cola to obtain soda machines for Reservoir, which, under its new management, wanted him to oversee vending operations. According to Caliri, during this call, he discovered that machines were being leased under his business name, Can Do Vending. He testified that he only became aware that Hancock had leased the machines under his name three days before he took possession of them. As

noted above, Caliri stated that he discovered Hancock had used his name to lease machines from Coca–Cola through personnel at Reservoir. Additionally, he intimated that Hancock removed his stickers from the office at Reservoir they shared without authorization.

Caliri described the situation as follows: There had been a management change at Reservoir and they were looking to ask me to do the vending in the building, they needed a vending service.

* * * * * *

I called Andrew Stinnet [at Coca–Cola]. Andrew Stinnet told me that there are nine machines already at Reservoir. I told him there wasn't. He told me under my profile there was.

* * * * * *

I asked him how there could be nine, and throughout the day I learned through the kitchen employees at Reservoir that Stoy ordered nine machines to go to Atlantic Union College.

Caliri testified that he obtained a list of equipment that Coca–Cola believed was at Reservoir and proceeded to Atlantic Union College. At first, he was denied admission to the campus. When he returned the next day, accompanied by a friend, he went to the Lancaster police station as a precaution and told the officers he was going to examine the machines at the college. He next approached security personnel at Atlantic Union College and told them he was going to look at the machines to compare the numbers on his list with those on the machines. Accompanied by a security officer, he proceeded to examine the machines. He stated, that once he verified the first machine was his, "that's when we called Lancaster police, and Lancaster police came down to verify also." At some point in time, Caliri and Moore encountered one another. Caliri stated

that he asked Moore, who had the keys to the machines, to escort him and his friend to the remaining machines so that they could remove Hancock's locks and take possession of them. Caliri stated that he gave Moore the paper money, and the overflow money from the coin box, and the locks, and gave the police a check payable to Thomson Vending in the sum of $288 for the balance of the coins that were still located in the machines.

Moore contradicted Caliri. He testified that Caliri took all the money from the machines. He stated:

Well, at that time Mr. Caliri stated that the machines were his machines and the money in them was his and that he was coming to get them, and—he was wanting all of the money, and being that I did not know the exact details, I believe I called Stoy on the phone and then we also called the police and have them come down to oversee what happened as it could be proceeded [sic].

* * * * * *

[T]he police came, and if I recall, the police also talked to Stoy on the phone and then I believe Stoy—I talked to Stoy on the phone after and it was decided that—that I was not going to hold onto the money, and the money was going to be going to John [Caliri], I believe. I recall that—if I recall correctly, I handed the money to the police officer to—let him take care of it, but I can't be a hundred percent certain if I handed it straight to the police officer or not. I'm pretty sure I did. He was wanting to know the amount on it, because I remember that, and I—I—did we didn't know the exact amount. And then I believe the police officer, if I remember right handed it to John, but

I'm a little unsure as to exactly what the police officer did with it.

* * * * * *

...[a]fter that, I handed all the money over and retained none of it.

* * * * * *

After the police officer left, we—it—it was understood by the police and every—and all of the parties that had discussed, we—John, myself and this other gentleman that was there, went to the other machines, I actually showed them where some of these machines were because they were unclear, and I opened up the machines and—and then they emptied the money out of the machines.

With respect to the machines at Waltham Crossings, Hancock testified that in February 2001, he "was requested to take out the locks and hand it [the soda machine] over to Caliri so that they [sic] could have it picked up." He indicated that he complied with the request and "[t]he product in the machine came out." He added that the cash was removed as well. Hancock stated that the snack machine was removed as well. He did not represent that Caliri took the money and the inventory in the machines.

In March of 2001, Hancock received a letter from the Executive Director of Waltham Crossings stating that she was terminating the facility's relationship "with Stoy Hancock of Management Solutions." She also stated: "[d]ue to a professional conflict between *the owners of the vending machine company,* they were unable to maintain the vending services as promised." (Emphasis supplied).

At about the same time, according to Hancock, Caliri also took possession of the vending machines Hancock had placed at Gateway in Framingham. Caliri took possession of Hancock's snack machine, as well as the soda machine, by drilling out the locks and replacing them with his own locks. Caliri took possession of the cash and product, as well. Caliri did not notify Hancock in advance that he changed the locks on the vending machines or that he was taking cash from the machines. Hancock testified that he did not know what happened to the machines after Caliri changed the locks, but he thought that Caliri took over the Gateway account.

Hancock testified that he estimated that there was approximately $175 worth of product in the snack machine and $231.50 worth of product in the soda machine, as well as $68 in cash in both machines located at Gateway. He estimated that his locks cost $14.50 and that his net weekly sales for the snack and soda machines were $22.60 and $30. Based upon his testimony, his total loss of product was $406.50 and his total loss of cash was $68.

With respect to the nine soda machines at Atlantic Union College, Hancock testified that when he returned from his wedding, he determined that his keys no longer fit in any of the locks. He was informed by Moore that the Debtor had replaced all of the locks. Additionally, Hancock obtained Caliri's check for $288 payable to "Thompson Vending." Hancock testified that he never cashed the check, which in the memo section provided: "Atlantic Union College, nine machines, nine coin machines at $32 each machine." By relying upon previous invoices, Hancock estimated that the machines contained approximately $306 in additional cash and $2,083.50 in product. As a result of the Debtor's conduct, Hancock testified that he lost his account at Atlantic Union College for approximately two months. He was eventually able to obtain nine replacement machines from Coca–Cola, but he had to wait to make use of them until Caliri removed the nine machines on loan from Coca–Cola to Can

Do Vending. Caliri failed to arrange for the machines to be picked up, and, eventually, Coca–Cola removed them. Hancock estimated that he lost approximately $290.70 per week as a result of the Debtor's conduct.

Hancock testified that he permanently lost his accounts at Waltham Crossings and Gateway as a result of Caliri's conduct. On May 12, 2001, Hancock, through counsel, sent Caliri a demand letter, through which he sought $20,000 in lost revenues, attorneys' fees and expenses. Caliri responded to the demand letter on June 19, 2001 denying all of Hancock's allegations. Caliri claimed that he retained possession of the product contained in the machines with an understanding that he would reimburse Hancock for the product. Caliri, however, failed to reimburse Hancock for the product because the two could not reach an agreement.

## III. POSITIONS OF THE PARTIES

Hancock claims that the damages he sustained as a result of the Debtor's actions are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6) as they resulted from the Debtor's willful and malicious conduct and larceny.

The Debtor denied having any sort of business relationship with Hancock, and further denied committing larceny. He claimed that when Hancock expressed an interest in getting into the vending machine business, he merely offered his help. The Debtor stated that he offered to refer Hancock to some of his business contacts to make it easier for Hancock to obtain products and equipment, but that this was the extent of their business relationship.

## IV. DISCUSSION

### A. *Applicable Law*

■ Section 523(a) provides that "(a) A discharge under 727 … does not dis-

charge an individual debtor from any debt … (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; … [or] (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 523(a)(2)(4) and (6). Exceptions to discharge, such as those set forth in § 523(a)(4) and (a)(6), are narrowly construed to further the fresh start policy embodied in the Bankruptcy Code. *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir.2002); *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994); *see also Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The plaintiff must prove exceptions to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 290, 111 S.Ct. 654.

### 1. Larceny

■ As the courts recognized in *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39, 53 (Bankr.S.D.N.Y.2001), and *Great American Ins. Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 594 (Bankr.E.D.N.Y. 1983), what constitutes larceny for purposes of § 523(a)(4) is a question of federal law. "Larceny is the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property." *Scheller*, 265 B.R. at 53; *Graziano*, 35 B.R. at 594.

### 2. Willful and Malicious Injury

■ "[I]n order to exclude a debt from discharge under the 'wilful and malicious' standard in § 523(a)(6), the creditor must show that: 1) the injuries complained of were the result of an act of the debtor done without justification or excuse; and 2) the debtor acted either intending to cause an injury or with substantial certainty that the injury would occur." *Gomes v.*

*Limieux (In re Limieux)*, 306 B.R. 433, 440 (Bankr.D.Mass.2004)(citing, *inter alia, Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853 (1st Cir.1997); *Read & Lundy, Inc. v. Brier (In re Brier)*, 274 B.R. 37 (Bankr. D.Mass.2002); and *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9 (Bankr.D.Me. 1998)).

■ A willful and malicious injury may include a conversion of the creditor's property. In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court held that an automobile dealer who borrowed money to purchase his automobiles had technically converted a lender's proceeds, but had not acted with malice where he failed to pay his debt to the lender and filed for bankruptcy protection. It stated: "[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances ... There may be an honest, but mistaken belief, engendered in the course of dealing, that powers have been enlarged or incapacities removed." *Id.* at 332, 55 S.Ct. 151. *See also UmbrellaBank v. Michel (In re Michel)*, 304 B.R. 33, 42 (Bankr. D.N.H.2004).

■ In *Thiara v. Spycher Brothers (In re Thiara)*, 285 B.R. 420, 427 (9th Cir. BAP 2002), the court observed that although federal law determines the nondischargeability of a debt, state law governs the elements of a conversion. In Massachusetts,

> The tort of conversion requires an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession. *See Third Nat'l Bank v. Continental Ins. Co.*, 388 Mass. 240, 446 N.E.2d 380, 383 (Mass.1983); Restatement (Second) of Torts § 222A (1965).

An action for conversion "'cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.'" *Grande v. PFL Life Ins. Co.*, No. 9663, 2000 WL 1476676, at *4 (Mass.App.Div. Sept.27, 2000) (quoting *Spooner v. Manchester*, 133 Mass. 270, 273 (1882)). It is no defense to conversion for defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods. *See Kelly v. Dubrow*, No. 1313, 2001 WL 287490, at *3 (Mass.App.Div. Mar.20, 2001).

*Kelley v. LaForce*, 288 F.3d 1, 11–12 (1st Cir.2002). *See also Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir.1993).

B. *Analysis*

1. Introduction

None of the witnesses who testified in this case were entirely credible, except the witness from Coca–Cola who authenticated the Move Orders. Moore and Hancock were friends, and Herr, though Hancock's superior at Reservoir and Mariner Health, borrowed money from him, suggesting that they were close friends as well. Although this Court cannot find either to be incredible, it appears that their testimony was colored by their association with Hancock. Neither Hancock nor Caliri was entirely credible either, and neither provided the Court with an explanation for their business association. Why would Caliri expend time and effort in assisting Hancock and permit him to use his relationship with Coca–Cola to obtain vending machines for placement at Atlantic Union College without remuneration? Why would Caliri give Hancock stickers with his logo for use on various machines if he and

Hancock did not have an arrangement? How could Caliri have remained oblivious to Hancock's actions for over a year and a half if their association was as limited as Caliri contends?

The Court infers from the conduct of Hancock and Caliri that their relationship may have been more in the nature of a partnership and that that relationship soured when Hancock accepted employment at Mariner Health. The Court, however, is puzzled as to why the Debtor would deny such an association, intimate that Hancock obtained machines from Coca–Cola to place at Atlantic Union College without his authority and surreptitiously use his stickers on those machines, when he admitted transferring his Gateway account to Hancock.

 The Court finds that the Debtor's testimony was less credible than Hancock's testimony. Hancock at least supported his testimony with a modicum of business records. Moreover, Caliri's version of the facts was characterized by more pronounced inconsistencies. He admitted that he sold Hancock an AP vending machine and permitted him to take over the Gateway account, yet he denied permitting Hancock to use the soda machines that were placed at Atlantic Union College. Why would he permit Hancock to take over the Gateway account but deny assisting Hancock with the Atlantic Union College and other accounts? Hancock's business records were incomplete, however, and he failed to establish that Caliri converted any of the soda machines to his own use for the simple reason that he failed to establish that he either owned them outright or loaned them from Coca–Cola in his own name or that of Thomson Vending. *See Scheller*, 265 B.R. at 53; *Evergreen Marine*, 4 F.3d at 95.

Although Hancock testified that machines he serviced were in various loca-tions, including Atlantic Union College, Gateway, Waltham Crossings, and Reservoir, his testimony as to the Debtor's conduct was only colorable with respect to the first two locations. Hancock testified that machines, products and cash were removed from Waltham Crossing, but not by the Debtor. He did not state what happened to the machines at Reservoir.

2. Larceny

The Court finds that Hancock failed to establish by a perponderance of the evidence larceny with respect to any soda machines at any location. As noted above, Hancock did not own any of the soda machines. Accordingly, Caliri could not have effectuated a felonious taking. *See Scheller*, 265 B.R. at 53.

 Hancock did prove, and the Debtor admitted, that he purchased the AP snack machine, located at Gateway, from Caliri for $2,000. Caliri changed the lock on that machine and deprived Hancock of the use of it at Gateway. Hancock, however, never attempted to retrieve the machine from the Gateway location, even though he owned it. Larceny involves a wrongful taking. Technically, there was no "taking away" of the machine to warrant a finding of larceny, but as will be discussed below, there was a conversion of it. Hancock appears to have abandoned his claim to the machine after Caliri changed the lock, and he testified he did not know what happened to it.

 Having resolved issues with respect to the machines themselves, the Court must address, the contents of the machines: the products and money in them. The Court finds that Hancock established that Caliri wrongfully took possession of the products in all the soda machines at Atlantic Union College and at Gateway and in the snack machines at

Gateway, and destroyed the two locks on the machines at Gateway worth $14.50 a piece. By changing the locks on the machines, Caliri prevented Hancock from removing the products he had placed in them. By taking possession of the machines and permitting the public to use them, he obtained the income from the inventory that was in them. Therefore, the Court finds that Caliri wrongfully took Hancock's inventory with the intention of converting it to his own use, and, thus, he is liable to Hancock for the value of the sodas and snacks in machines. Hancock established that the value of the products in the machines at Gateway totaled $406.50 and that the value of the products in the machines at Atlantic Union College totaled $2,083.50.

 With respect to the monies in the Gateway machines, the Court finds that Hancock established that Caliri wrongfully took $68 from the two machines at Gateway, plus the value of two destroyed locks (i.e., $29). By changing the locks, Hancock was denied access to the machines for purposes of removing products and money. With respect to the machines located at Atlantic Union College, Can Do Vending Services (Caliri's d/b/a) issued a check to Thompson Vending in the sum of $288. Moreover, even if this Court were to reject Caliri's testimony that he gave Moore monies from the soda machines located there and to accept Moore's testimony that he gave all the money to Caliri, Moore's testimony established that, as Hancock's agent, he turned over the money in the machines to Caliri with the understanding that Hancock and Caliri would resolve their dispute later. Under those circumstances, Caliri cannot be said to have unlawfully taken money with the intention of converting it, if it was voluntarily relinquished to him in the presence of Lancaster police and security personnel at Atlantic Union College. Thus, although Caliri may be liable for breaching an agreement as to how monies were to be divided, any such debt is dischargeable.

### 3. Willful and Malicious Injury

 The Court finds that Hancock failed to submit sufficient evidence for this Court to find that Caliri willfully and maliciously injured him or his property, except with respect to the AP snack machine at Gateway. In view of the conflicting and less than credible evidence on the part of both parties, the Court finds that Caliri did not act with the intent to cause injury to Hancock personally. Caliri assisted Hancock in establishing his vending business, and arguably permitted him to use soda machines at Atlantic Union College and elsewhere, but there was no evidence that he had a continuing obligation to permit Hancock to use the soda machines which had been loaned to Can Do Vending by Coca–Cola indefinitely. Hancock admitted that Caliri had a right to the return of the soda machines and only complained about the lack of notice given him by Caliri that would have enabled him to find replacement machines. Accordingly, with respect to Hancock's claims for damages for lost profits or business interruption, the Court finds that Hancock failed to sustain his burden of proof, particularly in the absence of evidence that his vending machine business ever made any money, and, in fact, lost money during 1999 and 2000.

 In view of the Court's findings with respect to Count III (§ 523(a)(4)) concerning the products and the money in the various machines, which findings also would support a determination of nondischargeability of a debt in the sum of $2,587 under § 523(a)(6) for conversion, the Court need only address Count IV regarding the snack machine owned by Hancock which

was located at Gateway. By forcibly removing and changing the lock on that machine, which he admitted doing, Caliri willfully and maliciously injured Hancock's property, which had a value of $2,000. The Court finds that Hancock established the required elements of a conversion for purposes of § 523(a)(6) in that Caliri wrongfully exercised dominion and control of the AP snack machine at Gateway at a time when he did not own and had no right to possession of the snack machine. Although he did not remove the machine from Gateway, he changed the lock on the machine, thus destroying its value to Hancock and depriving Hancock of the benefit of its use for his business. *See Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 95 (1st Cir.1993).

C. *Count II: Hancock's Claim under Chapter 93A*

 Section 2 of Mass. Gen. Laws ch. 93A, makes unlawful any "[u]nfair . . . acts or practices in the conduct of any trade or commerce." In *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 583 N.E.2d 806 (1991), the Supreme Judicial Court observed that "[t]his prohibition is 'extended to those engaged in trade or commerce in business transactions with others similarly engaged' by G.L. c. 93A, § 11." *Id.* at 474, 583 N.E.2d 806 (citing *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 779, 489 N.E.2d 185 (1986)). It added:

> We have said that conduct "in disregard of known contractual arrangements" and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes. *Wang Laboratories, Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 857, 501 N.E.2d 1163 (1986). *See Hannon v. Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 825, 434 N.E.2d 611 (1982) (if proved, submission of low bid

followed by demand for more money after award of contract would constitute violations of c. 93A). *See also Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 17–19 (1st Cir. 1985) (commercial extortion giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under contract not because of dispute over liability or inability to pay but, rather, as " 'wedge' against [plaintiff] 'to enhance [defendant's] bargaining power for more product" ').

Under § 11 of Mass. Gen. Laws ch.93A, "if the court finds for the petitioner, recovery shall be in the shall be in the amount of actual damages; or up to three, but no less than two, times such amount if the court finds that there use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two." Mass. Gen. Laws ch. 93A, § 11.

In *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1483 (1st Cir.1996), the First Circuit noted that § 11 does not define what conduct rises to the level of unfair or deceptive acts or practices in the conduct of any trade or business. *Id.* at 1483. The court, citing *Cambridge Plating Co. v. Napco, Inc.,* 85 F.3d 752, 768–69 (1st Cir.1996), observed that "[i]n weighing whether a defendant's conduct meets the statute's requirements, 'a common refrain has developed. The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Damon,* 87 F.3d at 1483 (footnote omitted, citations omitted). It added: "[i]n other words, a chapter 93A claimant must show that the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical,

'oppressive or unscrupulous.' " *Id.* at 1483–84.

Hancock did not argue or produce evidence that he and Caliri, in fact, were engaged in business together, although testimony to that effect may have explained the parties' relationship. Similarly, Hancock did not argue or produce evidence that he and Caliri were engaged in competition for various vending machine accounts. The parties had no written agreement, and both appeared reluctant to elaborate on the nature of their association beyond stating that Caliri assisted Hancock in establishing Thomson Vending, perhaps because they conducted their businesses at their place of employment and spent time on their respective business dealings when they should have been doing the jobs for which they were being paid by Reservoir, or perhaps because they knew that the uses to which they were putting the vending machines would not have be authorized by Coca–Cola. Whatever the reason, this Court finds that Hancock failed to satisfy his burden under Mass. Gen. Laws ch. 93A.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Hancock and against Caliri on Count I, in the sum of $2,587, and on Count IV in the sum of $2,000. The Court shall enter an order in favor of Caliri and against Hancock on Count II. Thus, a debt in the total sum of $4,587 shall be nondischargeable.